**UNITED STATES of America**

v.

**Joseph V. BEALL.**

**Crim. No. Y–83–00395.**

United States District Court,
D. Maryland.

March 6, 1984.

See also, D.C., 581 F.Supp. 1468.

Steven Allen, Asst. United States Atty., Baltimore, Maryland for plaintiffs.

Eugene P. Hines, Washington, D.C., for defendant.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

Defendant filed numerous motions in this criminal action which were followed by two evidentiary hearings. This Opinion resolves the outstanding motion to suppress and motion to dismiss for destruction of evidence.

### FACTS

Defendant filed a motion to suppress certain evidence seized from a truck he was driving as well as evidence obtained from a search of a U-Haul truck located in Dick's Auto Body Shop ("Dick's") in Elkridge, Maryland. On November 25, 1981, the Maryland State Police received a call from Ester Simms advising them that a truck was parked in the rear of her mother's residence located at 1513 Mathews Road, Severn, Anne Arundel County, Maryland and that a burglary was possibly in progress. Trooper First Class Ronald Price of the State Police went to the mother's residence to investigate. Upon his arrival relatives told him that the mother was in the hospital, that the truck did not belong there, and that several people had been around the truck. The truck was a white 1978 Ford step truck bearing Virginia tags, number XJA 916. After further investigation, Price learned that the tags had been issued to a 1981 GMC product. From police communications, he also learned that the last registered owner of the 1978 Ford, Jerry Fitzgerald, had allegedly indicated that the truck was no longer his. Unbeknownst to Price, Fitzgerald had not in fact been contacted. Testimony at the hearings indicated that a relative had given the defendant permission to park the truck at the Mathews Road residence. However, Price was also not aware of this.

Price had the truck towed to McBee's Tow Service ("McBee's") for safekeeping. McBee's had a contract with the Maryland State Police for the storage of impounded vehicles. According to McBee's owner at that time, the lot was fenced. Vehicles had to enter or exit through one of two gates which were padlocked during the hours the business was closed. On November 27, 1981, the Maryland State Police received a report that a theft had taken place at McBee's. Testimony from the owner and his brother indicated that the theft occurred between 9:15 and 9:40 p.m. One of the compound's gates had been removed from its hinges with the lock intact and then put back into place. A new lock for which the owners did not have a key had been placed on the other gate. During the theft, the white truck was stolen. Price testified that the State Police had never authorized the release of that truck from McBee's.

On that same night, Howard County Police Sergeant J.D. Richards, an experienced law enforcement officer with specialized training in drug enforcement, was on routine patrol in the Elkridge area of Howard County in an unmarked police cruiser. Accompanying him was Daniel King, Richards' wife's cousin and a participant in the "Ride-along" Program sponsored by Howard County Police. At about 9:45 p.m. Richards pulled up at a stop sign at the intersection of Railroad Avenue and Main Street. Three males, two blacks and one white, approached the cruiser. One of them, Herbie Hall, came up to the driver's side and told Richards that he should get over to Dick's because people were "ripping-off" the body shop and placing things into a U-Haul truck. Richards knew Hall by name, but not by face, because Hall had

been suspected of crimes in Elkridge. Hall handed Richards a piece of paper on which he had written a tag number, XJA 916 Virginia. Richards then looked into the lot, saw a white Ford truck and asked Hall if that was the truck. Hall indicated that it was. Richards asked Hall if the gate to Dick's was locked. Hall replied that it was not. From his position, Richards could only tell that the gate was closed, however, he did not see signs of forcible entry. Richards asked Hall why he was providing him with this information. Hall replied that he did not want Richards to think that he was responsible for the theft and that he wanted Richards to be his alibi to prove that he was not involved.[1] After Hall left, Richards saw a middle-aged white male walking at a rapid pace from the direction of Dick's. Richards then turned off his lights and observed 2–3 people moving around the white truck inside the compound. Richards moved his cruiser to a position along the fence line of Dick's compound. He called police communications and requested that contact be made with the owner of Dick's to determine if anyone had permission to be on the property. While waiting for an answer to his inquiry, he was advised that a breaking and entering had occurred at Dick's the night before. Richards interpreted this as indicating that the location was susceptible to burglary and then moved the cruiser so that it was facing in the opposite direction in order to be able to move more easily when the truck left.

From his new position Richards could see the office area of Dick's where the lights were on and where he observed a white male with a beard walk past the office window towards the office door. Richards then heard a "metallic noise" coming from the gate area of the chain link fence surrounding Dick's. Next he saw the headlights of the truck come on and observed another white male wearing a stocking hat walking rapidly on the street. He ap-

peared to have come from the area of the compound. The truck then left the compound.

Richards began to follow the truck. Although he testified that he was hoping to observe a traffic violation because he knew it was an excellent reason for stopping the truck, he also stated that he had not wanted to make a stop at Dick's since he was not sure how many people were involved in any criminal activity which might be taking place there. Once behind the truck, he observed that it displayed the same license tag number that Hall had given him. He followed the truck for a short distance and at an intersection in Howard County he observed the truck roll through a stop sign and continue without stopping. At that time, he informed police communications that he was going to make a stop and requested a back-up. The truck was stopped just inside Baltimore County, the first place where the shoulder was sufficiently wide to allow a safe stop. Richards testified that had the truck stayed in Howard County, he would have continued to follow it. Roughly, six minutes elapsed from the time Hall approached Richards, and the stop.

As soon as the truck was stopped, the driver got out and walked back to the front of the police cruiser. Based upon his training and experience, Richards felt this was significant since drivers typically took such action only when they did not want the officer to see the interior of the vehicle. Richards then asked the driver for his license and registration card. The driver handed him a license in the name of Joseph Beall, but did not produce a registration card. Richards repeated his request and Beall walked back to the truck entering on the driver's side. Richards followed the driver to the truck. Beall asked to borrow Richards' flashlight and Richards stood behind him as he retrieved the registration. Richards detected the odor of marijuana

---

**1.** The owner of Dick's Auto Body Shop stated that he had asked Herbie Hall to keep an eye out on the shop in the hopes of deterring theft. Testimony at the hearings also suggested that Herbie Hall may have been drunk at the time he made his statements to Richards. However, testimony indicated that he was sufficiently sober to run down a hill without stumbling.

coming from the cab, describing the odor as "significant" but not "overpowering." [2]

Beall showed Richards a Virginia registration card which indicated that the truck's license plates were for a 1981 GMC truck. When Beall returned the flashlight, Richards took it and shined it in the vehicle through the open door. He observed loose green vegetable material on the floor of the truck directly behind the driver's seat and on the "sliding track" separating the cab from the rear of the truck. The vegetable material appeared to Richards to be marijuana. At no time did Beall ask why he was stopped nor did Richards tell him why. Richards knew of no requirement that a person be told why he was stopped and testified that he chose not to give Beall a traffic citation since a marijuana charge is more serious.

Howard County Police Officer Daniel Snow arrived at this time. As he approached the truck's cab, Richards directed his attention to the green vegetable material behind the driver's seat and in the sliding track. Snow testified that he could smell the odor of marijuana.[3] When Richards asked Beall what he had been doing at the body shop, Beall stated that he was a friend of the owner and that he had keys to Dick's. Beall stated the truck was empty. Richards asked Beall if he would allow Richards to look in the back of the truck. Beall replied that he would allow him and then walked to the rear of the truck and gave the door handle a tug. He stated that he could not open the door since it was locked and he did not have the key.

Richards then walked back to the open driver's seat. He removed some green vegetable material which upon closer examination, confirmed his earlier belief that it was marijuana. Richards then formally arrested Beall. Officer Snow transported Beall to the police station where he removed all of Beall's personal effects and put them in an envelope in accordance with police procedure.

Meanwhile, Richards called for a tow vehicle to take the truck to police headquarters and impound it. He also showed the green vegetable matter to Daniel King and obtained a search warrant for the white truck. The padlock securing the rear door of the truck was unlocked and approximately 3,600 pounds of marijuana was discovered.

Richards later obtained a search warrant for the search of Dick's Body Shop. The documents submitted to the judge included a signed application for the warrant and an affidavit in support thereof which Richards neglected to sign. However, prior to the signing of the affidavit by the judge, Richards swore to the truth of the information contained therein. Howard County Detective Charles Gable was present at the search of Dick's Auto Body Shop. He stated that during the search, officers discovered a U-Haul truck which had marijuana on its back step, below the rear tag, and underneath the truck. The officers then opened the rear door of the truck and discovered a large quantity of marijuana. Howard County Police Officer Earl Rush arrived on the scene after the doors of the U-Haul had been opened but he testified that he also saw marijuana on the back step of the truck. During the search, the officers also found a key on the Shop's floor next to the passenger's side of the U-Haul. That key fit the lock on the back of the white truck. Records showed the U-Haul had been leased to Joseph Beall whose hand print was found on the tag attached to a key found in the U-Haul. Detective Gable later discovered that a key found among Beall's personal effects at the

**2.** Beall disputes the fact that Richards smelled the odor of marijuana emanating from the cab. However, he testified that Richards could have detected the odor of marijuana on his clothes.

**3.** Defendant introduced the testimony of an expert in the field of plant identification. After viewing the truck on December 10, 1981, the expert testified that he could detect no odor of marijuana. However, this Court is satisfied that any discrepancy between the testimony of the expert and the officers arises from the different conditions existing at the time of the search and of the viewing (*i.e.,* a significant difference in temperature).

police station fit the mysterious lock found at McBee's Towing. The owner of Dick's Auto Body Shop testified that he had given Beall permission to do some work on vehicles at his Shop, but not to store marijuana there.

## STOP OF THE WHITE TRUCK

Defendant Beall has filed a motion to suppress the marijuana discovered in the U-Haul and the white truck. He first argues that Richards' stop of the white truck violated the Fourth Amendment and that the unlawfulness of the stop taints the evidence subsequently obtained. *See United ed States v. Williams*, 589 F.2d 210, 214 (5th Cir.1979), *modified in part on other grounds*, 617 F.2d 1063 (5th Cir.1980). In response, the government argues that the stop was consistent with the standards established by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. Moreover, it claims that defendant has no standing to challenge the search of the truck.

In *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), the Supreme Court held that police could make an investigatory stop of a vehicle, *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), where objective facts and circumstances suggest that the vehicle is involved in criminal activity. In explaining the circumstances that justify such a stop, the Court stated:

> Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances— the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain commonsense conclusions about human behavior; jurors as factfinders are permitted to do the same— and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

449 U.S. at 417–18, 101 S.Ct. at 695 (Citations Omitted); *See United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

 In this case, the picture presented to Sergeant Richards, an experienced law enforcement officer with specialized training in drug enforcement, provided him with a particularized and objective basis for suspecting that the white Ford truck and its driver were engaged in criminal activity. His objective basis for suspecting criminal activity included such observations as the information from Hall that people were "ripping-off" Dick's and that they were loading goods into a truck; the piece of paper given him by Hall bearing the Virginia license plate number; Richards corroboration of Hall's information concerning the license number; Richards observations of activity in Dick's compound as well as of the two persons walking on the street in an unusual manner; the late hour of the observations and the date, namely the day

after Thanksgiving at 9:50 p.m.; the unsuccessful efforts to contact a representative of Dick's; the information that Dick's had been broken into the previous night; the nature of the vehicle, specifically, a box-type truck capable of transporting stolen goods; and the truck's failure to observe the stop sign.

In light of Richards' experience and expertise, these facts taken with the rational inferences reasonably drawn from them provided Richards with a particularized and objective basis for suspecting criminal activity. *See Terry v. Ohio,* 392 U.S. 1, 6, 88 S.Ct. 1868, 1872, 20 L.Ed.2d 889 (1968). From the piece of paper given by Hall, Richards could confirm that Hall had made more than casual observations. Moreover, the late hour, the report of a recent break-in and the furtive departure of several individuals would increase a trained police officer's concern that criminal activity was taking place. *See* J. Hall, *Search and Seizure,* § 10.11. Such factors elevated Richards' suspicion of crime above a simple inchoate and unparticularized "hunch." *Cf. United States v. Gooding,* 695 F.2d 78 (4th Cir.1982).

Defendant also claims that the stop was unlawful because Sergeant Richards, a Howard County police officer, was outside his jurisdiction. The stop of the truck in this case occurred just inside Baltimore County. However, immediately before the stop, while the truck was still in Howard County, Richards observed the truck fail to obey a stop sign, a misdemeanor in the state of Maryland. *See* Md.Ann.Code Transp. Section 27–101(a). Article 27 § 602A of the Maryland Code provides that a law enforcement officer may arrest a person anywhere in the state if the officer reasonably believes a felony has been committed within the officer's jurisdiction or if a misdemeanor has been committed within the presence of the officer in the officer's jurisdiction. In this case, Richards was acting well within his statutory authority since he had observed a misdemeanor being committed within his jurisdiction. That the officer made the stop just over the Baltimore County line cannot be faulted when,

according to testimony at the hearings, that was the first place in which he could do so safely.

Defendant argues that Richards' reliance on the failure to obey the stop sign was purely pretextual and, therefore, cannot justify Richards' stop of the truck. *See United States v. Cruz,* 581 F.2d 535 (5th Cir.1978). At the hearings, Richards testified that if the truck had remained in Howard County he would have continued to pursue it. He also stated that while pursuing the truck, he had his eye out for a traffic violation because he knew it was an excellent reason for a stop. Defendant claims that Richards cannot rely on § 602A to justify the stop if Richards had already determined to make the stop on *Terry* grounds. This Court declines to adopt such an either/or proposition. In this case, Richards had two legitimate grounds for making the stop, *Terry v. Ohio* and Md. Ann.Code Transp. Section 27–101(a). Defendant is correct that if an officer's sole justification for a stop was the pretext of a traffic violation, the stop would be invalid. *See, e.g., United States v. Keller,* 499 F.Supp. 415 (N.D.Ill.1980) (an officer noticed car in violation of city ordinances and stopped it solely because he hoped to recover evidence of a more serious crime, since "many times a traffic violation does lead to bigger things"). But where, as here, he has additional cause for making the stop, the stop is valid for those additional reasons, as well as, because of the traffic violation. In other words, the fact that Richards could have made a valid stop for *Terry v. Ohio* reasons at any point in Howard County does not vitiate his statutory authority to make a stop inside Baltimore County pursuant to § 27–101(a) because he witnessed a misdemeanor committed in his presence in Howard County.

## THE SEARCH OF THE WHITE TRUCK

Defendant also challenges the search of the white truck on the grounds that "probable cause for the search was not contained within the four corners of the affidavit to

search the locked compartment." This Court need not reach this issue because it finds that the defendant has not made a sufficient showing to assert a violation of the Fourth Amendment.

In *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1979), the Supreme Court stated that "a person who is aggrieved by an illegal search and seizure only through the introduction of evidence secured by a search of a third person's property has not had any of his Fourth Amendment rights infringed." 439 U.S. at 134, 99 S.Ct. at 425, and that to assert a violation of the Fourth Amendment a defendant must show that he had a "legitimate expectation of privacy" from government intrusion in the invaded area. *Id.* In *United States v. Hargrove,* 647 F.2d 411 (4th Cir.1981), the Fourth Circuit held that a defendant did not have such an expectation of privacy in a car he was driving when that car had been reported stolen. The burden was on the defendant to prove that he had acquired the car innocently and his failure to do so meant that he did not have capacity to assert a constitutional violation. Similarly in *United States v. Dickerson,* 655 F.2d 559 (4th Cir.1981), this circuit held that once the government had shown that the airplane was owned by a certain company, the defendant was required to produce some evidence that he had an interest in that company, or that he was flying it with the permission of the owner before he could object to the search.

In this case, defendant has introduced no proof of the truck's owner of record. The last known owner, Jerry Fitzgerald, testified that he sold the truck. However, Beall claims that he was borrowing the truck from a Mr. Phillips, now deceased, and that he had permission to park the truck at the Mathews Road residence. He admits that he knew the truck was towed to McBee's but he claims he had no knowledge of how it was retrieved from there. According to him on November 27, Phillips again loaned him the truck and asked him to keep the master key that was subsequently found to match the lock discovered at McBee's.

From these facts, he argues that he had a legitimate expectation of privacy.

▪ After considering defendant's testimony, this Court finds that he could not have had a legitimate expectation of privacy. Defendant made no showing that he had lawful possession or use of the vehicle. *See United States v. Sanchez,* 635 F.2d 47 (2d Cir.1980) (even though defendant had possession of the keys to the vehicle and the owner was never located, defendant did not have standing when he could demonstrate neither ownership nor license from the owner). Nor did he demonstrate how he could be in lawful possession when the truck had been unlawfully removed from McBee's. *See United States v. Hensel,* 672 F.2d 578 (6th Cir.1982) (defendant had no legitimate expectation of privacy in stolen vehicle). Under these circumstances, the Court finds that defendant has no capacity to object to the search of the white truck.

## SEARCH OF THE U-HAUL TRUCK

Defendant challenges the search of the U-Haul truck on three grounds: that the search warrant was improperly executed, that the search of the U-Haul was not encompassed within the scope of the search warrant, and that the search warrant did not establish probable cause. Initially, Beall argues that Richards' failure to sign the affidavit in support of the application for a search warrant to search Dick's Body Shop rendered the warrant a nullity even though both the application, which Richards did sign, and the affidavit were sworn to by Richards before the judge issuing the warrant.

Article 27, Section 551 of the Maryland Code, requires that a "written application signed and sworn to by the applicant" be presented for issuance of a search warrant. It further provides that the application be "accompanied by an affidavit." However, the statute does not specifically require the affidavit to be signed.

Beall relies on several Maryland cases to argue that the affidavit must be signed, but those cases appear factually inapposite to this case which involves a rather minor

technical deficiency. For example, in *Duggins v. State*, 7 Md.App. 486, 256 A.2d 354 (1969), the court found it impossible to determine the sufficiency of the warrant, where no warrant was produced. Here the government has produced the warrant. In *Howard v. State*, 199 Md. 529, 87 A.2d 161 (1951), the search warrant did not contain the name of the applicant on whose application the search warrant was issued as specifically required by the statute. Moreover, neither the applicant's name, nor the affidavit was shown to the accused, nor was the accused apprised of the name of the applicant. The Court, therefore, found that there had been no substantial compliance with the statute and that the warrant was defective. In contrast, the specific statutory requirements were met in this case. In *Smith v. State*, 191 Md. 329, 62 A.2d 287 (1948), the issue was whether the information set forth in the affidavit showing probable cause could be controverted. In *dicta*, the court suggested that an accused might be able to object to a search warrant if the affiant failed to swear to the affidavit as recited therein. Here, the issue is merely the failure of Richards to sign his affidavit accompanying his signed application. The signature of the judge on the affidavit attests to the fact that Richards swore to the affidavit.

This Court finds a case which presents facts similar to those currently confronting the Court, persuasive. In *United States v. Miah*, 444 F.Supp. 996 (E.D.Pa.1977), an F.B.I. agent appeared before a U.S. Magistrate to obtain a search warrant. He presented the magistrate an affidavit but he neglected to sign and date it. However, the agent did execute a "form affidavit" which he signed in the presence of the magistrate. The form affidavit incorporated by references the unsigned and undated affidavit which was attached. The defendant claimed that the failure to sign the affidavit as required by Federal Rule of Criminal Procedure 41C nullified the resulting warrant. Rejecting this argument, the Court stated:

> Had Agent Odom failed to sign and swear to the form affidavit, I might give

serious consideration to defendant's contention. The facts presented here, however, disclose at best a technical violation of Rule 41(c) which does not support suppression.

Defendant, without citing any authority, lengthily contends that the affiant's signature is critical to protect a criminal suspect from warrants issued upon false assertions of probable cause and to assure the accountability of persons making false assertions. Even if that contention is correct, however, in this case the defendant was adequately protected by Agent Odom's signature on the form affidavit. By that signature, Odom incorporated by reference the facts contained in the unsigned affidavit and swore to their truth. Since the unsigned affidavit was attached to the form affidavit, no mistake could be made as to its authenticity. The existence of the unsigned affidavit was equivalent to extra sheets which the agent might have attached when completing the "facts" section of the form affidavit because that section was too small for all the requisite information. While it would have been better procedure for Agent Odom to sign the additional sheets, his failure to do so at best constituted a technical and ministerial violation of Fed.R.Civ.P. 41, and thus is insufficient to support suppression. *See United States v. Hall*, 505 F.2d [961, 963 (3d Cir.1971) and cases cited therein: *United States v. Kennedy*, 457 F.2d] 63, 67 (10th Cir.), *cert. denied*, 409 U.S. 864, 93 S.Ct. 157, 34 L.Ed.2d 112 (1972); *United States v. Wilson*, 451 F.2d 209, 214 (5th Cir.1971), *cert. denied*, 405 U.S. 1032, 92 S.Ct. 1298, 31 L.Ed.2d 490 (1972).

\* \* \* \* \* \*

As the government points out, the language of Fed.R.Civ.P. 41(c) contains no requirement that the affiant sign this affidavit. Since I find the signature on the form affidavit to be sufficient under any interpretation of the rule, I do not

reach the issue of whether such a requirement should be inferred. 444 F.Supp. at 1001.

■ Here, the application incorporated the affidavit by reference and the statute did not specifically require the affidavit to be signed. Under those circumstances, the Court finds that the failure to sign the affidavit did not violate Section 551. Moreover, even if it had violated the statute, such an omission was at most a technical violation insufficient to support suppression.

The defendant also claims that the search of the U-Haul was unlawful since probable cause did not support the warrant and since the U-Haul truck was not encompassed within the scope of the search warrant. As with the challenge to the search of the Ford truck the first issue this Court must resolve is whether the defendant can assert any constitutional violation. A recent Fourth Circuit case suggests that the defendant cannot contest the search since he did not have permission to store marijuana on the premises of Dick's Body Shop. In *United States v. Ladd*, 704 F.2d 134 (4th Cir.1983), the court stated that one who "wrongly places unconcealed contraband within the house of another" has no legitimate expectation of privacy in the area searched. The court observed that the appellant had stashed his property on the premises "without a word of authorization from the owner." *Id.* at 135. In this case, defendant appears to have had permission from the owner of Dick's Body Shop to use the premises to work on vehicles, but not to store contraband. Moreover, two officers testified that marijuana appeared on the outside of the truck. Under such circumstances, it is doubtful that defendant can assert a reasonable expectation of privacy even when the U-Haul was registered in his name.

■ Yet, even assuming defendant did have a legitimate expectation of privacy in the U-Haul, his claims still fail: the warrant satisfied the requirements of the Fourth Amendment. Defendant argues that the search of the U-Haul was outside the scope of the search warrant for Dick's Body Shop. However, numerous circuit courts have upheld searches encompassing areas not specifically delineated in the search warrant. *See, e.g., United States v. Bulgatz*, 693 F.2d 728, 730 n. 3 (8th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 1203, 75 L.Ed.2d 444 (1982). There the defendants argued that the search warrant issued did not authorize search of their car parked in the garage attached to the house. In a footnote, the court noted that this contention did not warrant extended discussion since it was contrary to settled law.

The defendant also argues that the search warrant did not establish probable cause to believe that there was a controlled substance on the premises at the time the warrant was sought. In the affidavit supporting the application for the warrant, Sergeant Richards recited the events of November 27, 1981, the information from Herbie Hall, his observations of the activities at Dick's Body Shop, the stop of the white Ford truck, the heavy odor of marijuana coming from the truck, the loose marijuana on the floor of the cab, and his experience in the area of drug enforcement. He also stated that a search of the truck pursuant to a warrant led to the discovery of "numerous boxes and plastic trash bags of suspected marijuana."

■ As the Supreme Court has stated, "probable cause under the Fourth Amendment exists where the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe than an offense has been or is being committed." *Berger v. New York,* 388 U.S. 41, 55, 87 S.Ct. 1873, 1881, 18 L.Ed.2d 1040 (1967). An affidavit supporting the search warrant is presumed valid. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). From the information contained in this affidavit, the judge could infer that Dick's Body Shop contained controlled substances. The white truck had come from there. At least two individuals had been observed at Dick's

but only one had been stopped. The informant had indicated that persons were loading goods into a U-Haul truck. Moreover, the driver of the truck containing the marijuana had keys to the compound. All of these circumstances gave the judge issuing the warrant reason to suspect the additional evidence of Beall's activities would be contained within the body shop.

DESTRUCTION OF EVIDENCE

When Beall was arrested on November 27, 1981, he was driving a white Ford truck which he did not own. After his arrest, he was allowed to view the truck along with his counsel, and a chemist/botanist on December 10, 1981. They were able to photograph the truck and the marijuana in the truck. Thereafter, the truck was forfeited to the state of Maryland under Maryland Code Art. 27, Section 297 and it was recarpeted to be used as a van for a SWAT team. However, even though the state of Maryland publicized the impending forfeiture in local papers, defendant made no objection to the forfeiture until September, 1983, well after the fact.

Beall claims that the truck should have been left in its original condition so that this Court could view it in ruling on the motion to suppress. Beall argues that the destruction of evidence has prejudiced his ability to raise valuable defenses as to the credibility of the arresting officer. He also suggests that there may have been some collusion between the federal and state authorities which allowed the federal government to obtain a tactical advantage by having the case transferred from the state to the federal government.

█ As the Tenth Circuit stated in a case relied upon by both parties:

When evidence has been lost or destroyed, courts engage in "a case-by-case assessment of the government's culpability for the loss, together with a realistic appraisal of its significance when viewed in the light of its nature, its bearing upon critical issues in the case and strength of the government's untainted proof." *United States v. Grammatikos*, 633 F.2d

1013, 1019–20 (2d Cir.1980); accord *United States v. Picariello*, 568 F.2d 222, 227 (1st Cir.1978); *United States v. Heiden*, 508 F.2d 898, 902 (9th Cir.1974).

*United States v. Baca*, 687 F.2d 1356 (10th Cir.1982).

█ In *Baca*, the evidence was destroyed by state officers, not federal authorities pursuant to a routine order of the state district court. As in this case, nothing in the record showed collusion between the state and federal authorities prior to the destruction of the evidence. In affirming *Baca*'s conviction, the court noted:

*Baca* makes no showing of culpability on the part of the federal government for the loss of this evidence, and we decline to adopt a *per se* rule that destruction of important evidence by state officers prior to the issuance of a federal indictment precludes the federal government from prosecuting for violation of its laws.

687 F.2d at 1360.

Following the *Baca* criteria, Beall asserts that the evidence is crucial to his case. He claims that a viewing of the truck would have demonstrated the inaccuracy of the arresting officers' testimony. However, after having viewed the truck in its current state, this Court concludes that seeing the truck in its original condition would not be particularly helpful at this late date. What odor it gave off in November, 1981, surely would have dissipated by now. Indeed, for the odor to have remained the full 3,600 pounds of marijuana would have had to be left in the van. But the marijuana was removed in 1981, and destroyed in 1982. Moreover, the viewing of the truck demonstrated to this Court that any changes made during the conversion would not have altered Richards ability to spot the marijuana behind the driver's seat and in the sliding track even if he could not have detected the odor of marijuana as defendant alleges. *See Texas v. Brown*, — U.S. ——, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (officer can use flashlight to illuminate car). Thus, this Court

does not find that a viewing of the van in its original condition would resolve any issue as to the credibility of Richards testimony. Defendant took pictures of the van in 1981 and has several witnesses who can testify as to the odor emanating from it. Therefore, this Court denies the motion to dismiss based on the destruction of evidence. *See also United States v. Gidden,* 679 F.2d 19 (4th Cir.1982).