# Richmond

## Ferrel K. Phillips, Et Al. v. Charles Kiraly, Jr.

December 1, 1958.

Record No. 4816.

*Present, All the Justices.*

The opinion states the case.

*Thomas J. Michie and John T. Camblos* (*Robert E. Taylor; Michie, Taylor, Camblos & Deets*, on brief), for the plaintiffs in error.

*C. Armonde Paxson* and *D. B. Marshall* (*Paxson, Marshall & Smith*, on brief), for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This is a *habeas corpus* proceeding instituted on July 5, 1957, by Charles Kiraly, Jr. against Ferrel K. Phillips and Frederick H. Phillips, her husband, asking for the custody of Anne Allison Kiraly, the five and one-half year old daughter of Kiraly. Ferrel K. Phillips and Frederick H. Phillips, hereinafter referred to as Phillips, or as appellants, answered, alleging that Kiraly was not a fit and suitable person to have custody of his child from the standpoint of her welfare.

All of the evidence was heard *ore tenus* by the court, with the exception of three short depositions, two relating to the general reputation of Kiraly and the other to the extent of his interest in his child. At the conclusion of the evidence, the court granted the prayer of Kiraly, and awarded the custody of the infant to him, and Mr. and Mrs. Phillips obtained this writ of error.

The appellants contend that the judgment of the court is contrary to the law and the evidence. The specific grounds are that the father of the child is an immoral and financially unfit person to have her custody and that the welfare of his child will not be promoted by awarding her custody to him.

The evidence may be summarized as follows:

Charles Kiraly, Jr. married Miss Jerry Anne Keane, a daughter of Mr. and Mrs. Donald Keane, on February 3, 1951. Miss Keane had two sisters, Audrey Keane, who married Marvin C. Robinson, Jr. and Ferrel Keane, who married Frederick H. Phillips.

Anne Allison Kiraly, daughter of the appellee, was born February 29, 1952, and a second child, Donald Charles Kiraly, was born November 3, 1953. Anne and her mother contracted poliomyelitis in July, 1955, and Mrs. Kiraly died on August 13, 1955. Anne had a severe attack, with facial paralysis; but, through constant treatment, has now almost completely recovered.

The death of Mrs. Kiraly left her husband with the responsibility

of taking care of two young children, one of whom was seriously ill. He was also burdened by the lack of financial means because of debts incurred in a business venture. Faced with this situation, he accepted the offer of Mr. and Mrs. Phillips to take and care for Anne, and the offer of Mr. and Mrs. Robinson to do the same for Donald, with the understanding that the custody in both cases was only on a temporary basis. He agreed that he would aid as much as possible towards the support of the children. Because of the demands of military service upon their respective husbands, neither Mrs. Phillips nor Mrs. Robinson was able to take the children immediately. Consequently, both of the children were placed with their maternal grandparents, Mr. and Mrs. Donald Keane, residents of Albemarle County. They remained with their grandparents until January, 1956, when Mr. and Mrs. Phillips took Anne in their home in Charlottesville, and the Robinsons took Donald to their home at Fort Knox, Kentucky, where they then resided.

In support of their contention that Kiraly was an unsuitable person to have the custody of his child, the appellants introduced testimony relating to their charges that he was dishonest, morally unfit, financially irresponsible, and without proper love for or interest in his infant daughter. It will serve no good purpose to set out in detail that evidence.

Mr. and Mrs. Keane, the father-in-law and mother-in-law of Kiraly, testified that he had made false statements to them with respect to his education, career, financial status, and the former occupation of his father. There was no corroboration of their testimony, and it was positively contradicted by Kiraly.

There was some evidence relating to the irregular conduct of the business affairs of appellee, his statements relating to the extent of his assets and the payment of his debts, the issuance of checks by Kiraly and his first wife without sufficient funds to pay them, the taking of nude photographs in his professional work, and that he had been engaged in a so-called "Peeping Tom" episode in the summer of 1953. The evidence does show that his business ventures were financially unsuccessful. He had entered business upon release from the United States Navy, and neither he nor his wife was qualified by training or experience in practical business matters. Mrs. Jerry Anne Kiraly kept the books of the business, while he gave his attention to production and distribution. She knew nothing about accounting or bookkeeping, and as a result when their busi-

ness was wound up, the records were so involved and confused as to require the aid of a certified public accountant to straighten them out. According to the record, however, Kiraly has satisfied, or arranged to satisfy, his creditors and those of his first wife.

Kiraly's first wife knew that he took photographs of nude women, sometimes known as "figure photography," said to be "a branch of the artistic end of photography." A witness, who was associated with Kiraly in that particular work, testified that he never saw anything improper in the relationship between the photographer and his subject. There was no evidence to the contrary.

The evidence relating to the charge that Kiraly acted as a "Peeping Tom" in the summer of 1953, was of a rather vague and indefinite nature. Kiraly denied any improper action, and explained that at the time alleged he was trying to locate a nighttime prowler or trespasser, known to be active in the locality near where he lived.

The evidence with reference to the issuance of "bad" checks was explained as being due to improper accounting and the existence of unusual situations. It was admittedly unwise, indiscreet and careless in several of the instances.

There is no merit in the claim that Kiraly was lacking in love and affection for his daughter. His letters to her relatives, and his visits to her clearly manifested his concern for her welfare. He carried her daily from her grandparents' home to the kindergarten which she attended, visited her on Sunday afternoons, and often drove her home from school. After she went to live with appellants, he continued to take her to school nearly every day, and to see her on Sunday afternoons except on rare occasions. Sometimes he acted as a baby-sitter for the appellants when they left their home. He contributed little to his daughter's support; but when he did leave a check with appellants, it was returned to him with the suggestion that he use the money towards payment of his debts. During this period, Kiraly and his first wife's relatives kept on friendly terms.

It is clear both from his letter to appellants, written just fifteen days after the death of his wife, that he placed his child with the Phillips purely on a temporary basis, and at all times indicated a desire to resume her custody when he was able to give her a proper home.

In January, 1957, when Kiraly was notified by the Phillips that he must either permit them to adopt Anne, or make other arrangements for her care, he repeated his prior statements that he was un-

willing to give her up permanently. It was agreed between the parties that a final decision must be reached by August, 1957. In the meantime, Kiraly and Miss Margo Calvert were planning to be married, and they began to make arrangements for a home for themselves and Kiraly's two children. On April 2, 1957, Kiraly wrote to the Phillips that he had decided to take his child with him, and thanked them for their aid and kindness to Anne.

Kiraly and Miss Calvert were married on May 5, 1957. He then made arrangements to sell his business in Charlottesville, to settle his obligations there, and to move to Cleveland, Ohio, where his parents resided. He said he had obtained a position in Cleveland doing special photographic work along lines with which he is familiar, at a salary of $125 a week. He has made necessary arrangements to provide a suitable home and dwelling place in Cleveland for his wife and two children. When he requested Mr. and Mrs. Phillips to release his daughter to him, both refused.

Kiraly, thirty-four years of age, and in good health, testified at length concerning his education, his business ventures, his financial situation, his remarriage, and his new employment in Cleveland. He had studied engineering prior to his enlistment and service in the United States Navy, especially in connection with photographic work. Upon his release from the Navy as an Ensign at the end of World War II, he undertook to establish a business as a professional photographer in Charlottesville, Virginia. This business he continued after his marriage to Miss Keane. Kiraly and his wife lived happily together. Mrs. Kiraly aided him in his photographic business as a joint operator, with Kiraly doing the photographic work and Mrs. Kiraly attending to the financial end of the business. Mrs. Kiraly also undertook first with assistance of a friend, and later alone, the publication of a magazine called "Visit," which turned out to be an unprofitable venture. As we have hereinbefore said, both Kiraly and his wife were poor business managers, inexperienced in self-employment and in business practice, and their financial situation went from bad to worse.

Kiraly spent considerable time engaged in extensive scientific research work, looking towards improved methods of processing photographic films. His work so impressed the Dean of the Department of Engineering of the University of Virginia, that he was allowed to utilize the facilities of the University to continue his studies even though he had no connection with the University. The Dean

had known Kiraly since 1944, when he was a member of a Naval Unit attending the University, in the Engineering Department. He became interested in Kiraly's research work because it involved electronics, one of the Dean's major interests.

Kiraly is an active member of the Rotary Club of Charlottesville, Virginia, as the elective representative of the photographic membership classification.

Eleven witnesses, persons prominent in the social and business life in the Charlottesville area, testified that Kiraly's reputation for truth and veracity, as a law abiding citizen, and as a person of good moral character was very good or excellent. Among these witnesses were friends of the first Mrs. Kiraly, college associates of Kiraly, business executives, retired officers of the armed forces, the Dean of Engineering at the University of Virginia, and the Pastor of the Westminster Presbyterian Church in Charlottesville.

Several of the above witnesses, including the minister, said that Mrs. Margo Kiraly was not only a young woman of excellent training and character; but that she possessed unusual qualifications to be a foster mother to her husband's children. She was, at the time of the hearing, twenty-five years old, a graduate nurse, with considerable nursing experience, including pediatric nursing. She was currently working under a cancer research grant at the University of Virginia Hospital. She testified that she had a deep love for young children, and particularly for Anne Kiraly, whom she had taken out on occasion. She further testified that her early home life was somewhat similar to that to which Anne Kiraly was subject. She said that she taught in a Sunday school for a while, had had a great deal of association with children in her hospital work, and had taken [in her training] courses in child dieting. She said she did not plan to continue her professional work when she went to Cleveland.

The character and qualifications of Mrs. Margo Kiraly give every reason to expect that little Anne will receive, in the home of her father and foster mother, that degree of care, love and affection to which every child is entitled.

■ All conflicts in the evidence were resolved in favor of Kiraly by an able and experienced trial judge, who saw and heard the witnesses testify. The finding of the judge upon the credibility of the witnesses, and the weight to be given to their testimony stand upon the same basis as a verdict of a jury. It is presumed to be correct and the burden is upon him who assails it to show that it is wrong.

*Williams* v. *Williams*, 192 Va. 787, 791, 66 S. E. 2d 500; *Sutton* v. *Menges* 186 Va. 805, 809, 44 S. E. 2d 414.

■ There is no dispute as to the principles which control the determination of this case. It is almost universally held that the welfare of the child is the paramount and controlling consideration in determining who shall have the custody of the child. The strong presumption is that the best interests of the child will be served by placing it in the custody of its natural parents or surviving parent, unless such parents are unfit or unsuitable. In Virginia, the parents of unmarried minor children are, by the provisions of Virginia Code, 1950, § 31-1, declared to be their natural guardians, "* * * and upon the death of either parent the survivor shall be the natural guardian of the person of such child. * * *." The burden of showing existence of circumstances which would deprive the parents of the right to custody is on the person opposing the right, and the evidence justifying the separation of a child from its parents must be cogent and convincing. *Lawson* v. *Lawson*, 198 Va. 403, 408, 94 S. E. 2d 215; and cases and authorities therein cited.

The principles to be applied to the facts in this case have been set out in the long line of cases, which began with *Merritt* v. *Swimley*, 82 Va. 433, 3 Am. St. Rep. 115, and are followed in the more recent cases of *Sutton* v. *Menges, supra; Williams* v. *Williams, supra; Judd* v. *Van Horn*, 195 Va. 988, 81 S. E. 2d 432; and *Lawson* v. *Lawson, supra.*

Appellants rely upon a number of cases, in which we either affirmed the lower court's decision refusing a father's request for custody, or reversed a decision granting custody to the father. The facts and circumstances of each of those cases differ from those here. In most of them there was a voluntary relinquishment or abandonment by the father of his right to custody, a prolonged period of actual residence by the child with another custodian, or the father was shown to be an unsuitable person to have the custody.

■ It appears from the record that the trial court gave consideration to all of the evidence before it. It realized that it was naturally upsetting to the child to be removed from the home in which and the persons with whom it had resided for a period of time. It recognized that Kiraly had to place his child with someone under the force of the distressing circumstances existing at the time of his first wife's death, and that he had always refused to give permanent custody to anyone. Any rule which would take from an

otherwise fit and suitable father the custody of a child because he had previously been unsuccessful in his financial affairs would uproot many children from their parental homes and break up many families.

There is ample evidence to sustain the findings and the judgment of the court; and, therefore, the judgment is affirmed.

*Affirmed.*