**Richmond**

JUNE ALLEN GOODWIN

v.

COMMONWEALTH OF VIRGINIA

No. 0412-85

Decided October 7, 1986

250

COUNSEL

J. Barrett Jones, for appellant.

John H. McLees, Jr., Assistant Attorney General (William G. Broaddus, Attorney General, on brief), for appellee.

OPINION

**MOON, J.**—June Allen Goodwin appeals his conviction in a jury trial in the Circuit Court for the City of Charlottesville for attempted rape. The sole issue on this appeal is whether Goodwin, a

twenty-eight year old mildly retarded person, knowingly, intelligently, and voluntarily waived his *Miranda* rights before confessing to the crime.

Goodwin was arrested on the evening of September 21, 1984, following an allegation by Pearl Marie Rush that he attempted to rape her. At trial, Rush testified that after she left work around 4:00 p.m. on September 21, she and Carol Binion walked to Binion's house, which took approximately one hour, so that Rush could baby-sit Binion's two children. Goodwin came over to Binion's house after the two women had arrived. Goodwin talked to the two women for awhile and Binion later went jogging while Rush remained to watch the children. Goodwin then left on his bicycle after he and Rush agreed that he would return with some beer. He returned on his bicycle a short time later with a six-pack and both Goodwin and Rush sat outside on the porch and drank some of the beer.

Rush then testified that, because it began to get dark, she told Goodwin to leave so she could put the children to bed. She then entered the house and locked the door, but one of the children let Goodwin into the house when he knocked on the door. Rush stated that Goodwin asked for some water and she repeated her request for him to leave. However, he then pulled a knife from his pocket and demanded that she lay down on the kitchen floor, which she did. He then began beating her, grabbed her arm, and told her to go into the bedroom. When they got to the bedroom, Rush pushed Goodwin to the floor and she ran out of the house with the children. Goodwin then left but was arrested when he returned to Binion's house later that night.

Sergeant Pleasants read the *Miranda* warnings to Goodwin at the police station before Goodwin confessed to the attempted rape. His confession, in pertinent part, read:

> I saw a black girl today on Altavista Ave. She told me I could bring some beer and marijuana to her house tonight. I got a pint of vodka but I couldn't find no marijuana. I took some beer and some vodka to her house on Altavista Ave. . . . We drank it and I told the girl how about some sex. I tried to wrestle with the girl. She saw my penis in the living room. . . . My zipper is down because I showed her my penis. While we were wrestling we fell on the floor. She was

yelling NO - NO and was fighting me off. She beat me off of her. If I could have held her I would have screwed her. I am not drunk now. I make this statement freely.

At a suppression hearing before trial, Goodwin claimed that his mental retardation and his alleged extreme intoxication at the time of the confession rendered him unable to understand his rights or to make a knowing, intelligent, and voluntary waiver of those rights. He asserts that the trial court erred in admitting the confession and that we must make an independent determination of this issue. We agree that the question of voluntariness is a legal question requiring an independent review on appeal, but we also conclude that Goodwin knowingly, intelligently, and voluntarily waived his *Miranda* rights and confessed to the crime.

The prosecution bears the burden of proving that the defendant knowingly and intelligently waived the constitutional privilege against self-incrimination and the right to counsel. "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Although the defendant may waive these rights, it must be shown that "the waiver is made voluntarily, knowingly and intelligently." *Id.*

If a confession is not " 'the product of a rational intellect and a free will,' the confession is inadmissible because coerced." *Townsend v. Sain*, 372 U.S. 293, 307 (1963) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960)); *see Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

In considering the standard of review in this case, we are confronted with two separate questions: (1) the standard of review of a trial court's finding of the voluntariness of a confession; and (2) the standard of review concerning the finding of the validity of a waiver of *Miranda* rights.

On the issue of voluntariness of a confession, the Supreme Court of Virginia has held that it is a question of fact as to which the trial court's finding will be upheld unless plainly wrong or without evidence to support it. *Boggs v. Commonwealth*, 229 Va.

501, 512, 331 S.E.2d 407, 416 (1985); *Rodgers v. Commonwealth*, 227 Va. 605, 608-09, 318 S.E.2d 298, 300 (1984). However, the United States Supreme Court recently held that the issue of the voluntariness of a confession is a legal question requiring independent review by an appellate court, based upon the entire record. *Miller v. Fenton*, 106 S. Ct. 445, 451 (1985); *Beckwith v. United States*, 425 U.S. 341, 348 (1976) (citing *Davis v. North Carolina*, 384 U.S. 737, 741-742 (1966)).

The Commonwealth concedes in its brief that this court is "constrained to apply the analysis of the United States Supreme Court on the voluntariness issue." However, it also contends that the United States Supreme Court has not extended the "independent determination" standard to findings of the validity of waivers of *Miranda* rights. The Commonwealth submits that this issue is one of fact and we agree. *See Miller*, 106 S. Ct. at 449 n.3; *Acres v. Commonwealth*, 216 Va. 40, 46, 216 S.E.2d 28, 32 (1975); *accord Patterson v. Cuyler*, 729 F.2d 925, 930-32 (3d Cir. 1984).

We must determine whether, in light of the totality of the circumstances, including not only the details of the interrogation, but also the characteristics of the accused, the statement was the product of an essentially free and unconstrained choice by its maker, or whether the maker's will was overcome and his capacity for self-determination critically impaired. *See Wyrick v. Fields*, 459 U.S. 41, 49 (1982) (per curiam); *Schneckloth*, 412 U.S. at 225-26; *Washington v. Commonwealth*, 228 Va. 535, 547-48, 323 S.E.2d 577, 586 (1984); *Rodgers*, 227 Va. at 609, 318 S.E.2d at 300. The mental retardation of the accused is one factor to consider in making this determination. *Reck v. Pate*, 367 U.S. 433, 442 (1961); *Culombe v. Connecticut*, 367 U.S. 568, 625, 633 (1961); Annot., 8 A.L.R.4th 16, 21 (1981).

> [T]he retarded person may be abnormally susceptible to coercion and pressure . . . [may] make a false confession out of a desire to please someone perceived to be an authority figure . . . [may] not understand, and may be incapable of understanding, the ramifications of a confession, and his right not to confess.

Ellis & Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L. Rev. 414, 446 (1985).

## I.

We must first determine if Goodwin made a knowing, intelligent, and voluntary waiver of the *Miranda* rights. Goodwin contends that his mental retardation and extreme intoxication at the time of his confession rendered him incapable of understanding his rights under the fifth and sixth amendments, thus preventing a knowing, intelligent, and voluntary waiver of his rights.

Regarding his retardation as affecting his capacity to intelligently waive his rights, Goodwin relies upon the testimony of Lucille Michie, a retired school psychologist who examined Goodwin in 1970, when he was fourteen years old, approximately fourteen years prior to the confession. She testified that Goodwin's I.Q. at that time was about 56, placing him in the educable mentally retarded range. She had not examined Goodwin since then. She did state that the test given Goodwin at that time to assess his mental ability was educationally and socioeconomically biased, possibly affecting the results because Goodwin is black and from a low socioeconomic background. Michie felt that Goodwin's I.Q. may have even gone down because of further school separation or emotional difficulty subsequent to the examination. However, it was brought out at trial that, although Goodwin received social promotion, he did attend school with the Department of Corrections while in its custody. Goodwin's reading level was most recently tested at a first grade level, which Michie said indicated that he only recognized words rather than comprehending them. Goodwin testified that he could not read handwriting and could not read any part of the alleged statement he made, other than the printed portions.

Michie expressed the opinion that several of the *Miranda* warnings were stated in terms too abstract or complex for easy comprehension by a mentally retarded person and that Goodwin could only understand them if they were explained very concretely. She also did not believe that Goodwin would have used such terms as "marijuana" or "penis," nor would he have used complex sentences such as those contained in his confession. She did admit that Goodwin had the intellectual capacity to learn, especially the language of the street. She stated that he could have understood the *Miranda* warnings if he had "seen a lot of T.V. and heard it over T.V." or if he had heard the warnings read to him many

times before.

With regard to the drinking, Goodwin stated that he and his two brothers began drinking between 9:00 and 10:00 a.m. on September 21, 1984. They had vodka, several bottles of bourbon, and an unspecified quantity of beer. He stated that they stopped drinking when it started to get dark. His brother said that Goodwin was very drunk. Sunset occurred at 7:14 p.m. on September 21, 1984. Goodwin's aunt, Oweda Jackson, testified that she saw and talked to Goodwin around sunset on that day and that he was "very polluted." She later stated that she actually saw him approximately fifteen minutes after she got off from work and that she normally got off from work at about 4:00 p.m.

Another witness testified that Goodwin purchased two hotdogs from a local store, gave the clerk a five-dollar bill and left without collecting his change. When the clerk went out to give him his change, she saw him weaving on the street on his bicycle. This incident occurred about the same time Oweda Jackson saw Goodwin, which led the trial judge to believe that it occurred about 4:30 p.m. The prosecutrix, who telephoned the police at 8:00 p.m., testified that she thought Goodwin was drunk because his eyes looked very red and his clothes were dirty.

All of the police officers who came in contact with Goodwin that day said that he had an odor of alcohol about him. Officer Thacker, who arrested Goodwin at the scene of the attempted rape, described how Goodwin ran up a flight of fifteen steps in an attempt to elude the police. After arrest, Goodwin's hands were handcuffed behind his back but he was still able to walk up steps without assistance or without difficulty. Sergeant Pleasants who interviewed Goodwin at the police station observed the odor of alcohol also. When Goodwin first saw Pleasants, Goodwin recognized Pleasants as being the officer who had, in August, 1984, investigated a prior incident, unrelated to this case, involving Goodwin. Goodwin told Pleasants he wanted to talk to him. Pleasants took Goodwin into a lounge to interview him. Goodwin displayed no motor difficulty in walking from the lockup to the lounge. Goodwin told Pleasants that he had been drinking but that he was not drunk at the time he was making the statement.

With regard to the *Miranda* warnings, Pleasants asked Goodwin whether he knew his rights, and Goodwin recited a few

of them. Pleasants then read the *Miranda* rights to Goodwin from a standard form. Goodwin stated orally that he knew what his rights were and that he wished to make a statement. He signed the waiver of rights form at 9:00 p.m. Pleasants described Goodwin as appearing the same as he had on a previous occasion when Pleasants had interviewed him: Goodwin appeared to be in control of himself and answered Pleasants' questions in an understandable manner. Goodwin also told Pleasants that he had a fifth grade education and could read and write. Pleasants testified that he wrote down what Goodwin told him, but that he, Pleasants, cleaned up the statement at certain points, for example, using the word "screwed" instead of "f_____."

Based upon this evidence, the trial court made the following findings of fact:

1. That Goodwin had been highly intoxicated at the time his aunt and the store clerk saw him on September 21.

2. That Oweda Jackson's testimony was most probative in fixing the time at which she and Hancock saw Goodwin because she knew she had gotten off work by 4:40 p.m. and had seen Goodwin within 15 minutes thereafter.

3. That the police interview of Goodwin had occurred more than three hours after he was seen in this intoxicated state.

4. That the police officers' testimony together with the coherence and accuracy of the statement proved that, at the time of Goodwin's confession, Goodwin was sufficiently sober to knowingly, intelligently, and voluntarily waive his *Miranda* rights and confess.

5. That Goodwin had sufficient intellect to, and in fact did, know and understand his *Miranda* rights.

6. That, in the light of the totality of the circumstances, Goodwin's waiver of *Miranda* rights and subsequent statement were the product of an essentially free and unconstrained choice by Goodwin, and that his will had not been overborne or his capacity for self-determination critically impaired.

The trial judge's evaluation and determination is supported by substantial and credible evidence. *See Acres*, 216 Va. at 46, 216 S.E.2d at 32.

## II.

■ We must next determine if Goodwin's confession was voluntary. Even though we must make an independent evaluation of the evidence to determine whether the confession was voluntary, we may rely upon the observations of the trial judge and the trial judge's findings of fact, except as to the ultimate issue of voluntariness, in making our independent evaluation. This reliance on the trial judge's observations is justified because he was in the best position to evaluate the credibility of the witnesses, *Phillips v. Kiraly*, 200 Va. 345, 350-51, 105 S.E.2d 855, 859 (1958), even though the observations involved an inquiry into the defendant's state of mind, and even though the resolution of these questions is dispositive of the ultimate constitutional question. *Miller*, 106 S. Ct. at 451-52.

Goodwin argues that to find his confession voluntary is to totally ignore, as he claims the trial judge did, the testimony of Lucille Michie. However, we consider her testimony in light of the other evidence in the case. Michie expressed the opinion that Goodwin would not have made the statement: "If I could have held her, I would have screwed her." She reasoned that it was a complex sentence which Goodwin would not likely have the intelligence to form. However, when asked during trial what he had bought at the liquor store, Goodwin responded: "I can't recall what type of liquor it was, but I bought some liquor there." Goodwin also stated: "I remember going into a store, but I don't remember which store it was," when asked if he recalled going into a store to buy some hot dogs. Finally, when asked if he made the statement concerning his intent to have sex with Rush, Goodwin said: "I don't care if I was drunk, I wouldn't make that statement."

Furthermore, we are persuaded that little emphasis should be placed on Michie's opinion that a person of Goodwin's intellect would not have used the terms "marijuana" and "penis," especially since she stated Goodwin had the capability to learn the "language of the street." These words are no more complicated or

sophisticated than many other words and phrases that Goodwin used in his testimony. A twenty-eight year old person capable of learning the language of the streets could have learned these words just watching television, as Goodwin frequently did.

Michie further admitted that if Goodwin had his rights repeated to him or had heard them on television, this might assist his understanding. The confession and rights waiver form and the statement form executed by Goodwin in this case were identical to the ones executed by him several months earlier in August, 1984, which indicates that Goodwin had been previously exposed to the *Miranda* rights. There also was testimony that Goodwin had seen the rights explained on television.

Finally, Michie's testimony was based on her examination of Goodwin in 1970. The failure to consider Goodwin's education and experience during the intervening fourteen years reduces the credibility of her analysis of Goodwin's current capabilities.

Goodwin's trial testimony coincided in many respects with that of the victim, as well as his earlier statement to the police except that, at trial, Goodwin denied that he attempted to rape the victim and he denied pulling a knife on her. He testified that he remembered talking to Rush on the evening of September 21, 1984, leaving at one point to bring back some liquor, entering the house and asking her for sex, and making a statement to the police later that night, although he stated that he did not remember its contents. However, he testified that he only got angry at Rush and started to wrestle with her after she refused his request for sex. At the suppression hearing, Goodwin admitted that he had pulled his zipper down that evening, as stated in the confession, but at trial, Rush did not mention whether Goodwin exposed himself to her.

If we believe the police officer and the victim, as the trial judge did, then it would appear that Goodwin, at the time of his confession, had a very good understanding and recollection of what had taken place that evening. The judge also observed that Goodwin appeared to know and understand what was going on in the trial. For example, Goodwin made a point of personally requesting to see the indictment in his trial. He admitted making a statement to the police, but claimed not to remember what he said. On cross examination, the prosecutor was unable to lead Goodwin into

making any damaging admissions. The transcript of Goodwin's testimony does not reveal that his mental faculties were so impaired by his retardation and intoxication that he could not remember what he had done and why he had done it, and whether it was advantageous to admit or to deny at trial that he confessed.

Therefore, based upon our independent examination of the record in this case, we conclude that Goodwin's will was not overcome, that his capacity for self-determination was not critically impaired, and that his confession was the product of a free and unconstrained choice. Accordingly, the conviction is affirmed.

Since the issues raised in this case will undoubtedly come before this Court again, we commend the trial judge's efforts in delineating as many specific findings of fact as possible to aid our review of the case.

*Affirmed.*

Barrow, J., and Duff, J., concurred