# CIRCUIT COURT OF THE CITY OF SUFFOLK

Commonwealth of Virginia

v.

Eugene Wilkins

August 10, 2000

Case No. CR99-00226

BY JUDGE D. ARTHUR KELSEY

The Commonwealth accuses Eugene Wilkins of two counts of possession of cocaine with intent to distribute in violation of Va. Code Ann. §§ 18.2-248 and 18.2-248.1 (Michie 1996 & Supp. 2000). In his pretrial motion to suppress, Wilkins claims the Commonwealth obtained in-custody statements

from him in violation of the Fifth Amendment and collected physical evidence against him in violation of the Fourth Amendment. *See* Defendant's Motion to Suppress (Jan. 6, 2000), Defendant's Response to Bill of Particulars (Apr. 19, 2000), Defendant's Letter Brief (July 20, 2000). For the following reasons, the Court denies the motion.

## I

According to the Commonwealth, the defendant has been a "major supplier of crack cocaine" in both Suffolk and Portsmouth for several years. *See* Commonwealth Ex. 1 (search warrant affidavits). The investigation into his activities began in February 1999 when officers of the Suffolk and Portsmouth Police Departments conducted a "controlled purchase" of cocaine through the use of a confidential informant. *See* Hearing Transcript at 17-23.

The informant, CI,[1] purchased cocaine from the home of Calvin West on February 25, 1999, after the defendant had allegedly dropped off the product at West's home just prior to the purchase. *Id*. From conversations between West and CI,[1] the police learned that the defendant supplied the cocaine in marketable quantities to West. Purchasers from West would know that a delivery by the defendant had taken place by looking at West's porch light: if the light was on, business was off; if the light was off, business was on. *Id*. at 21-23. CI[1] also stated that the defendant carried a handgun and would typically stay at West's home to assist in the sales taking place throughout the day. *See* Commonwealth Ex. 1 (search warrant affidavits).

Again on June 16, 1999, the police conducted a similar controlled purchase from West's home. *See* Hearing Transcript at 24-30. As before, the defendant drove his brown Plymouth van to West's home (while the porch light was on) and dropped off the cocaine for resale (after which the light was turned off). The defendant carried a "white bag" as he left his own home and brought it with him when he entered West's home. *See* Commonwealth Ex. 1 (search warrant affidavits). On this occasion, a different confidential informant, CI,[2] went into West's home and met with the defendant. *Id*. The defendant pulled a "large piece of crack cocaine" from the white bag and sold it to CI.[2] *Id*.

A similar pattern developed on June 17, 1999, with one variation. On that day, the defendant stopped by an intermediate location (a house on Bridge Road in Suffolk) between leaving his home and arriving at West's home to make the drop off. During their surveillance at the Bridge Road location, police officers saw the defendant walk "to the side of the house or towards the side of the garage area." *Id*. at 29. The officers briefly lost visual contact with

the defendant because of a "big tree on the side of the house." *Id.* at 35. The police observed the defendant "coming and going" from this same area. *Id.* An El Camino vehicle (later discovered to be owed by the defendant) was "parked right behind the big tree" on the side of the house. *Id.* Then "just a few minutes, very short few minutes" later, the defendant got back in his van and drove "straight" to West's home to make the cocaine drop. *Id.* at 29. $CI^2$ arrived later and made another controlled purchase directly from the defendant. *See* Commonwealth Ex. 1 (search warrant affidavits).

Based upon the information then in hand, the police secured search warrants for West's home (6117 Brookwood Drive, Portsmouth), the defendant's home (100 Waterview Road, Suffolk), and the defendant personally. *Id.* The next day, June 18, the police decided to conduct a fourth controlled purchase before arresting the defendant. $CI^2$ went to West's home early that morning. The porch light was on, indicating that the defendant had not yet made his delivery. *See* Hearing Transcript at 30. $CI^2$ spoke with West to confirm this. *Id.* at 31. West said he had no cocaine, but the defendant "would be en route shortly with some." *Id.* During the conversation between West and $CI,^2$ West called the defendant on a cell phone at about 9:00 a.m. *Id.* The police, who had been tracking the defendant's movements, saw the defendant answer the cell phone call while driving in his van. *Id.* at 31-32.

The defendant drove his van to the Bridge Road location. *See id.* at 32; Commonwealth Ex. 1 (search warrant affidavits). Once there, the defendant "got out of the vehicle and went to the side of the house again." Hearing Transcript at 32. As before, the defendant walked "right behind the big tree, and exactly behind the big tree is where the El Camino was." *Id.* at 58. The defendant stayed a "short time" at the Bridge Road premises and then made a brief stop at his own home before driving to West's residence on Brookwood Drive. *Id.* at 31-32.

By this time, however, West had become suspicious. Before the defendant's arrival, West got in his car and drove away from his home. *Id.* at 33. About a block or so from his home, West passed the defendant's van, slowed down briefly, and continued to drive away. *Id.* at 33. Realizing that the sting had begun to fall apart — or, to put it in police vernacular, that they had been "burnt" — officers on the tactical team stopped the defendant's van less than a block or two from West's house and arrested the defendant for distributing drugs. *Id.* at 50-51.

The arrest took place at approximately 9:45 a.m. on June 18. *Id.* at 48. The police conducted a search and discovered cocaine in the pockets of blue "sweat pants" located between the driver and passenger bucket seats of the van. *Id.* at 79 and 52. The drop-off routine used in prior occasions, plus $CI^2$'s

confirmation that the defendant "transported drugs in a van," led the officers to believe probable cause existed for the vehicle search. *Id.* at 48. They also believed it likely that, absent the search and recovery, evidence "could be destroyed." *Id.* at 50.

After the defendant's arrest, the police drove him back to his own home. At the defendant's home, a member of the Special Investigations Unit, Detective DeFreitas, asked the defendant "if he had been Mirandized," and he said "he didn't know." Hearing Transcript at 63. The detective then "Mirandized" the defendant. *Id.* DeFreitas recited the *Miranda* warnings from his "memory" without using notes or a preprinted card. *Id.* at 72. The detective then asked the defendant "if he understood his rights." *Id.* at 63. The defendant replied that "he understood his rights." *Id.*

The detective then asked the defendant "if he wished to talk to [him] without an attorney present." *Id.* at 63. The defendant said "yes, he would talk" to the detective. *Id.* DeFreitas and the defendant had a "continuous" conversation until about noon when the defendant announced that "he wanted to speak to a lawyer." *Id.* at 64. The detective promptly suspended any further interrogation. "I told him I couldn't talk to him any more," the detective explained. *Id.*

The defendant's wife disagreed with her husband's decision and argued with him about it. As the detective remembers it: "She was constantly badgering Mr. Wilkins about cooperating with the police and telling the police if he knew where the drugs were, or any drugs, and she couldn't believe that he was involved in that, and if he was, that he should cooperate." *Id.* at 65; *see also id.* at 73-74. Detective DeFreitas testified that he did nothing to encourage the defendant's wife to influence her husband on this point. *See* Hearing Transcript at 65. The defendant has not challenged this testimony.

At about 2:30 p.m., the defendant deferred to his wife's wishes and told Detective DeFreitas that he wanted to talk "in another room." *Id.* at 65. After walking down the hall to an unoccupied bathroom, the defendant announced that "he wanted to cooperate and tell [the police] where the drugs were." *Id.* DeFreitas said "no," he could not talk with him "because he had already asked for an attorney" earlier in the day. *Id.* at 66.

The defendant explained that he had "changed his mind" and now "wanted to talk." *Id.* He then said that he would take Detective DeFreitas "to where the drugs were." *Id.* DeFreitas brought the defendant back into the front room of the house, in the presence of two other detectives, where the defendant confirmed that he had changed his mind and now wanted to "talk without an attorney." *Id.* at 67. The defendant then told Detective DeFreitas that the drugs could be found in his vehicle (the El Camino) at the Bridge

Road location, *id.* at 67, the same place he had visited on June 17 and 18 prior to arriving at West's home.

The defendant and DeFreitas drove to the Bridge Road location together. The defendant walked with DeFreitas over to the El Camino and said, "it is in the back seat." *Id.* at 68. Detective DeFreitas looked, but found nothing.

Though DeFreitas did not know it at the time, just a "few minutes" before his arrival another police officer (Detective Wright) had searched the El Camino and found cocaine and digital scales. *Id.* at 68 and 78. Wright conducted the search after receiving a radio call from another officer, Detective Chappell, stating that he had just obtained a search warrant for the Bridge Road location. *Id.* at 77. Both Wright and Chappell were unaware that the defendant had confessed to DeFreitas and agreed to the search of the El Camino. *Id.* at 79 and 53-54, 59. The search by Wright was "purely based" on Chappell's newly issued warrant. *Id.*

Detective Chappell, a seventeen-year veteran of the force, had decided to secure the search warrant for the Bridge Road location not long after the defendant's arrest that morning. *Id.* at 34. He had prepared the original affidavits in this case (as well as over 300 or more during his career), and he drafted the affidavit for the Bridge Road location because he believed it served as a "stash house" for the drug distribution scheme. *Id.* at 53. This conclusion rested on several considerations: (i) the defendant made two brief, suspicious visits to the side of the Bridge Road home before making anticipated cocaine deliveries at West's home, (ii) the defendant in fact had cocaine with him at the time of his arrest, and (iii) the defendant kept a vehicle in the "same area" (near the big tree) that he was "observed coming and going from." *Id.* at 35, 39, 53-54, 57-58; *see also* Commonwealth Ex. 1 (search warrant affidavit for Bridge Road).

Chappell's affidavit for the warrant included almost verbatim all of the information about the distribution pattern presented in the earlier affidavits, but added that on both June 17 and 18 the defendant stopped at the Bridge Road location. On June 17, he "was observed going towards the side door." Commonwealth Ex. 1 (search warrant affidavit for Bridge Road). On June 18, he also "went up to the side of the house." *Id.* The affidavit then went on to state that the defendant, as he had before, later went to West's home to drop off the cocaine. *Id.* The search warrant affidavit noted that an El Camino, owned by the defendant, was "parked in the driveway" of the Bridge Road residence. *Id.* In addition, the affidavit states that the affiant, Detective Chappell, had been in law enforcement for many years and had extensive experience investigating narcotics offenses. See Commonwealth Ex. 1 (affidavit for Bridge Road search warrant). Over the years, Chappell had

attended "several hundred hours" of professional education on the topic of drug distribution. *Id.*

The affidavit contained one notable mistake. The affidavit asserted that earlier that morning, police had arrested the defendant and found "a quantity of cocaine on his person." *Id.* In fact, the police found the cocaine in a pair of sweat pants in the defendant's van — between the driver and passenger seats. *See* Hearing Transcript at 79, 52, 55-56. In any event, the magistrate accepted the affidavit's proffer of probable cause and issued the search warrant for the Bridge Road home "with a carport" and any "out buildings and curtilage." Commonwealth Ex. 1 (search warrant for Bridge Road location). The magistrate issued the warrant at 1:30 p.m., about an hour before the defendant's confession. *Cf. id.* (time entry on warrant) with Hearing Transcript at 65.

## II

The defendant challenges the admissibility of his in-custody statements to Detective DeFreitas, including the one that led them to the defendant's vehicle at the Bridge Road location in search of cocaine. The interrogation, the defendant contends, violates the principles of *Miranda v. Arizona*, 384 U.S. 436, 469-73 (1966); *see also Dickerson v. United States*, 530 U.S. ___, 120 S. Ct. 2326 (2000) (reaffirming the continued viability of *Miranda*). For two independent reasons, the Court disagrees.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const., Amend. V. A suspect subject to custodial interrogation "has the right to consult with an attorney and to have counsel present during questioning," and that the police must "explain this right" to the accused before questioning begins. *Shackleford v. Commonwealth*, 32 Va. App. 307, 322, 528 S.E.2d 123, 131 (2000) (quoting *Davis v. United States*, 512 U.S. 452, 457 (1994)).

Once advised of his *Miranda* rights, a suspect may make a knowing and intelligent waiver of those rights and respond to the police interrogation. *See North Carolina v. Butler*, 441 U.S. 369, 373-75 (1979); *Shackleford*, 32 Va. App. at 322, 528 S.E.2d at 131. The Commonwealth must prove by a preponderance of the evidence that the waiver was made voluntarily, knowingly, and intelligently. *Shackleford*, 32 Va. App. at 322-23, 528 S.E.2d at 131 (citing *Goodwin v. Commonwealth*, 3 Va. App. 249, 252, 349 S.E.2d 161, 163 (1986)).

The defendant argues that "there is no testimony in the present case that this [the right to counsel] or any other rights were mentioned." Defendant's

Letter Brief at 2 (July 20, 2000). Without actually coming out and saying it, the defendant apparently contends that Detective DeFreitas's shorthand expression "I Mirandized him" does not carry any intrinsic meaning. To shoulder its burden of persuasion, the defendant implies, the Commonwealth had to ask Detective DeFreitas to recite from the witness stand the well-known *Miranda* incantation.

It goes without saying, however, that "*Miranda* has become embedded in routine police practice to the point where the warnings have become part of our national culture." *Dickerson*, 120 S. Ct. at 2336. It has become so much a part of our national culture that courts routinely refer to the act of a police officer providing the *Miranda* warnings as having "Mirandized" a suspect. To be sure, the very fact that a *case name* has so effortlessly morphed into a *verb* shows that it has acquired through common use a colloquial meaning — one well known both by the courts and the public.[1]

In this case, Detective DeFreitas testified that he personally "Mirandized" the defendant before initiating any conversation with him. He recited the *Miranda* warnings by memory and made sure the defendant "understood his rights." Hearing Transcript at 63, 72. The interrogation abruptly ended when the defendant insisted on exercising his right to consult an attorney. *Id.* at 64. At that time, DeFreitas made it clear that he could not talk with the defendant anymore. *Id.*

Later in the day, when the defendant decided to cooperate, Detective DeFreitas again "told him no, I couldn't talk to him because he had already asked for an attorney and I couldn't talk to him." *Id.* at 66. The defendant made clear, however, that he wanted to waive the right to counsel. DeFreitas then confirmed, in the presence of two other detectives, that the defendant wanted "to cooperate and talk without an attorney." *Id.* at 67.

The testimony of Detective DeFreitas satisfies the Commonwealth's burden of showing that the defendant received an adequate warning and chose voluntarily to talk with DeFreitas without the presence of counsel. Indeed, the fact that the defendant insisted upon one of his *Miranda* rights (albeit until his

---

[1]  For examples of Virginia courts using the shorthand expression "Mirandized" to describe the act of giving the *Miranda* warnings, *see Taylor v. Commonwealth*, 31 Va. App. 54, 58, 521 S.E.2d 293, 295 (1999); *Mitchell v. Commonwealth*, 30 Va. App. 520, 527, 518 S.E.2d 330, 333 (1999); *Hayes v. Commonwealth*, 29 Va. App. 647, 651, 514 S.E.2d 357, 359 (1999); *Welshman v. Commonwealth*, 28 Va. App. 20, 28, 502 S.E.2d 122, 126 (1998); *Giles v. Commonwealth*, 28 Va. App. 527, 531, 507 S.E.2d 102, 105 (1998); *Green v. Commonwealth*, 27 Va. App. 646, 648, 500 S.E.2d 835, 836 (1998); *Pemberton v. Commonwealth*, 17 Va. App. 651, 653, 440 S.E.2d 420, 422 (1994).

wife talked him out of it) corroborates the conclusion that he received a constitutionally compliant warning.[2] For this reason, the defendant's motion to suppress must be denied.

The motion also fails for a second, and more fundamental, reason. In *Miranda*, the U.S. Supreme Court made clear that "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda*, 384 U.S. at 478. No interrogation exists within the meaning of *Miranda* when the suspect initiates the conversation. *See Gates v. Commonwealth*, 30 Va. App. 352, 355-56, 516 S.E.2d 731, 733 (1999); *see also Jenkins v. Commonwealth*, 244 Va. 445, 453, 423 S.E.2d 360, 365 (1992). It makes no difference whether the suspect is in custody at the time of the volunteered statement. Nor does it matter that the suspect had been subjected, at other times, to interrogation. *See Bradshaw v. Commonwealth*, 228 Va. 484, 490, 323 S.E.2d 567, 570-71 (1984) (a "spontaneous admission," after an earlier refusal to cooperate, does not violate *Miranda*).

As noted earlier, the defendant's confession did not come in response to any custodial interrogation. The questioning of Detective DeFreitas had ended two and a half hours earlier when the defendant stated he wanted an attorney. At the time of the confession, no "objective observer" would have viewed the words or actions of DeFreitas as being "designed to elicit an incriminating response" from the defendant. *Gates*, 30 Va. App. at 355-56, 516 S.E.2d at 733 (citations omitted).

Volunteered statements of this kind should be admitted if they are "neither induced nor initiated by the officer." *Bradshaw*, 228 Va. at 490, 323 S.E.2d at 570-71. To put it differently, police investigators "do not interrogate a suspect simply by hoping that he will incriminate himself." *Jenkins*, 224 Va. at 453, 423 S.E.2d at 365 (quoting *Arizona v. Mauro*, 481 U.S. 520, 529 (1987)). For this reason as well, the Court denies the motion to suppress the defendant's in-custody statements to Detective DeFreitas.

## III

The defendant also claims Fourth Amendment violations took place during the issuance and execution of the search warrants in this case. To the extent the defendant invokes constitutional guarantees arising under Article

---

[2] Though the defendant does not carry the burden of proof, it is telling that the defendant's counsel failed to question Detective DeFreitas on *any* specific warnings after the Detective testified that he "Mirandized" the defendant.

I, § 10, of the Virginia Constitution, the state law analysis tracks the federal law interpreting the Fourth Amendment of the U.S. Constitution. *See Henry v. Commonwealth*, 32 Va. App. 547, 551, 529 S.E.2d 796, 798 (2000). "Evidence obtained in violation of the Fourth Amendment is inadmissible in a criminal prosecution for a charged criminal violation pertaining to the seized evidence." *Anderson v. Commonwealth*, 20 Va. App. 361, 363, 457 S.E.2d 396, 397 (1995), *aff'd*, 251 Va. 437, 470 S.E.2d 862 (1996). For this reason, the defendant contends, the evidence seized from his van (stopped on the way to West's home) and from his El Camino (parked at the Bridge Road residence) should be suppressed.

With respect to both searches, the defendant raises two levels of objections. First, the defendant argues that the affidavits provided insufficient information upon which the magistrate could make a probable cause finding. Second, the defendant contends that the warrants, in any event, did not apply to the defendant's two vehicles.

The defendant's first argument requires an examination of basic principles of probable cause — the essential requirement for the issuance of any search warrant consistent with the Fourth Amendment. "[N]o warrants shall issue, but upon probable cause, supported by oath or affirmation." U.S. Const., Amend. IV. *See Lester v. Commonwealth*, 30 Va. App. 495, 500, 518 S.E.2d 318, 320 (1999); *Gwinn v. Commonwealth*, 16 Va. App. 972, 974, 434 S.E.2d 901, 903 (1993).

> Probable cause, as the very name implies, deals with probabilities. These are not technical; they are the factual and practical considerations in every day life on which reasonable and prudent men, not legal technicians, act. Probable cause exists when the facts and circumstances within the arresting officer's knowledge and of which he has reasonable trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense had been or is being committed.

*Derr v. Commonwealth*, 242 Va. 413, 421, 410 S.E.2d 662, 666 (1991) (citation omitted). In determining whether the affidavits are sufficient, courts "must look to the totality of the circumstances." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983)).

Probable cause is a "flexible, common-sense standard" — one that does not "demand any showing that such a belief be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983) (citations and internal quotation marks omitted). "A practical, nontechnical probability that

incriminating evidence is involved is all that is required." *Id.* In other words, the process "does not deal with hard certainties, but with probabilities." *Id.* "Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same — and so are law enforcement officers." *Id.*

Given the fluid nature of the probable cause concept, both the U.S. Supreme Court and the Virginia Supreme Court have rejected "a hypertechnical, rigid, and legalistic analysis" of probable cause. *Illinois*, 462 U.S. at 238-39; *Derr*, 242 Va. at 421, 410 S.E.2d at 666. Under this "common sense" approach, the magistrate's task:

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Id.* (citations omitted).

An "after-the-fact review of a magistrate's decision should not be made *de novo*," and thus, "great deference should be given to the magistrate's finding of probable cause." *Derr*, 242 Va. at 421, 410 S.E.2d at 666; *see also Illinois*, 462 U.S. at 236; *Garza v. Commonwealth*, 228 Va. 559, 563, 323 S.E.2d 127, 129 (1984). And for good reason: a "grudging or negative attitude" by the courts directly conflicts with the Fourth Amendment's "strong preference" for searches conducted pursuant to a warrant. *Id.*; *see also United States v. Ventresca*, 380 U.S. 102, 108-09 (1965). As a result, "the scrutiny applied to a magistrate's probable-cause determination to issue a warrant is *less than* that for warrantless searches." Ronald J. Bacigal, *Virginia Criminal Procedure* § 4-17, at 85 (4th ed. 1999) (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)) (emphasis added).

After all, the nexus between the "items to be seized and the place to be searched may be established by the nature of the item and the normal inferences of where individuals would likely keep such items." Ronald J. Bacigal, *Virginia Criminal Procedure* § 4-6 at 67 (4th ed. 1999). In other words, the magistrate "need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." *Gwinn v. Commonwealth*, 16 Va. App. 972, 975, 434 S.E.2d 901, 903 (1993) (citations omitted).

In the case of "drug dealers," a magistrate can draw reasonable inferences when evaluating likely places where the contraband might be found. *Id.* It need not be shown "more likely true than false" that incriminating evidence would be found at the location specified in the warrant, *Texas,* 460 U.S. at 742, only that the likelihood of a successful search would be consistent with "common-sense conclusions about human behavior." *Id.*

Given the totality of the circumstances, probable cause existed for the issuance of the search warrants in this case. The police investigation outlined in the various affidavits shows a sufficient likelihood that the defendant had been (and continued to be) engaged in a predictable pattern of drug distribution. The allegations involving the "several years" of purchases allegedly made by an informant from this drug ring, three controlled purchases by two confidential informants, consistent use of the porch light signal, cell-phone call just prior to West's unexpected departure before the final aborted sale, defendant's actual participation in sales to end-users, defendant's reputation as a "major supplier of crack cocaine," and other details provided by the confidential informants all demonstrate that a search of the defendant and his vehicles might likely find the incriminating evidence sought by the warrants.

Generally, an informant's controlled buy constitutes probable cause sufficient for a magistrate judge to issue an arrest warrant. *McGuire v. Commonwealth,* 31 Va. App. 584, 596, 525 S.E.2d 43, 49 (2000) (citation omitted); *Tamburino v. Commonwealth,* 218 Va. 821, 825-26, 241 S.E.2d 762, 765 (1978)). The same should be equally true for search warrants.

That conclusion applies not only to the search warrants for the defendant personally and the West residence, but also for the search of the residence and "curtilage" at the Bridge Road location. The affidavit made clear that the defendant parked one of his cars there and made two brief, suspicious visits to the side of the home on both June 17 and 18 prior to driving to the West residence to make his drop off. And, as expected, he had cocaine with him at the time of his arrest. Searching an area visited by a suspected drug dealer just prior to his last two drug deliveries satisfies the common-sense test for sufficiency required by the Fourth Amendment.

Even if the warrants could be attacked on sufficiency grounds, Virginia has "embraced and applied the good faith exception to the exclusionary rule." *Polston v. Commonwealth,* 255 Va. 500, 503, 498 S.E.2d 924, 926 (1998). Under this exception, "evidence illegally seized is admissible if the officer conducting the search reasonably relied on a search warrant issued by a detached and neutral magistrate." *Colaw v. Commonwealth,* 32 Va. App. 806,

811 (2000) (quoting *Atkins v. Commonwealth,* 9 Va. App. 462, 464, 389 S.E.2d 179, 180 (1990)).

In the ordinary case, "an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Tart v. Commonwealth,* 17 Va. App. 384, 390, 437 S.E.2d 219, 222 (1993) (citation omitted). Thus, the "deterrent effect of the exclusionary rule 'is absent where an officer, acting in objective good faith, obtains a search warrant from a magistrate and acts within the scope of the warrant'." *Janis v. Commonwealth,* 22 Va. App. 646, 653, 472 S.E.2d 649, 653, *aff'd en banc,* 23 Va. App. 696, 479 S.E.2d 534 (1996) (citation omitted).

The good faith exception does not apply in four situations: where (i) the magistrate was misled by information in the affidavit which the affiant knew was false or should have known was false, (ii) the issuing magistrate "totally abandoned his judicial role," (iii) the warrant was based on an affidavit "so lacking in indicia of probable cause" as to render official belief in its existence unreasonable, or (iv) the warrant was so "facially deficient" that an executing officer could not reasonably have assumed it was valid. *Polston,* 255 Va. at 503, 498 S.E.2d at 926; *Colaw,* 32 Va. App. 806; *Robinson v. Commonwealth,* 19 Va. App. 642, 647, 453 S.E.2d 916, 918 (1995); *Atkins,* 9 Va. App. at 464, 389 S.E.2d at 180.

Neither of the four disqualifying situations exists here. Nothing in the warrant affidavits materially misled the magistrate. Though the affidavit for the Bridge Road warrant mistakenly stated that drugs had been found on the defendant's "person" (rather than in the van he was driving), this error could not have a material impact on the probable cause determination. Nor did the magistrate totally abandon his judicial role or accept a bare-bones affidavit "so lacking in indicia of probable cause" or "so facially deficient" that reliance on it could be challenged as patently unreasonable. The good faith exception to the exclusionary rule, therefore, further protects the Bridge Road warrant from challenge.

The defendant's second argument, dealing with the *scope* of the search warrants, raises several issues. To begin with, the defendant correctly points out that the search warrant for him personally did not authorize a search of the van he was driving. This proposition, standing alone, runs into the well-recognized exceptions to the warrant requirement for searches of automobiles generally and searches of vehicles incident to lawful arrests.

Because of the mobility of vehicles, they may be searched without a warrant if a police officer has probable cause to believe that the vehicle contains contraband. *See Pennsylvania v. Labron and Kilgore,* 518 U.S. 938,

940 (1996) ("[I]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."); *United States v. Ross*, 456 U.S. 798, 806-08 (1982); *Carroll v. United States*, 267 U.S. 132, 149 (1925); *McCary v. Commonwealth*, 228 Va. 219, 227-28, 321 S.E.2d 637, 641 (1984). The officers who arrested the defendant, therefore, had authority to search his van given the abundant probable cause that it contained cocaine destined for delivery at the West residence.

Moreover, the search of the defendant's van constituted a search incident to a lawful arrest. "The only prerequisites to a search of an automobile incident to arrest are that the search is contemporaneous with the arrest and the arrestee's recent occupancy of the vehicle." *Armstrong v. Commonwealth*, 29 Va. App. 102, 112-13, 510 S.E.2d 247, 252 (1999); *Glasco v. Commonwealth*, 26 Va. App. 763, 773, 497 S.E.2d 150, 154 (1998), *aff'd*, 257 Va. 433, 513 S.E.2d 137 (1999). The circumstances surrounding the search of the defendant's van satisfy both prerequisites, rendering the search lawful under the search-incident-to-arrest exception to the warrant requirement.

The defendant makes a different argument concerning the search of his El Camino parked at the Bridge Road residence. He claims that the warrant did not authorize the search of his vehicle, only the residence itself. The affidavit, however, identified clearly the presence of one of the defendant's vehicles at the Bridge Road location. The affidavit also described the defendant's brief visits to this location on June 17 and 18, shortly before the defendant's arrival at the West drop-off site. And the warrant itself, while not referring directly to any vehicles, specifically applied to the "curtilage" of the dwelling. *See* Commonwealth Ex. 1 (search warrant for Bridge Road location).

The "great weight of authority supports the proposition that a search warrant authorizing the search of a dwelling covers the occupant's automobiles found within the curtilage of those premises, even where the vehicle is not named in the warrant." *Glenn v. Commonwealth*, 10 Va. App. 150, 156, 390 S.E.2d 505, 508-09 (1990); *Kearney v. Commonwealth*, 4 Va. App. 202, 205, 355 S.E.2d 897, 899 (1987). The defendant concedes this general point, but argues that it does not resolve "whether a vehicle of someone other than an occupant of the premises could be searched." *Glenn*, 10 Va. App. at 156, n. 1, 390 S.E.2d at 508, n. 1. That precise issue has not been addressed by either the federal or state courts in Virginia.

The fundamental issue here stems from the constitutional requirement that only warrants "particularly describing the place to be searched" may be lawfully issued. U.S. Const., Amend. IV. The curtilage of a dwelling, as one commentator has argued, would ordinarily be thought to cover only "vehicles

under the control (actual or apparent) of the person whose premises are described." 2 Wayne R. LaFave, *Search and Seizure*, § 4.10(c), at 668 (3d ed. 1996). But the "language in many of the decisions," this commentator admits, "suggests no such limitation" on the concept. *Id.* Indeed, courts have taken several different positions on this issue.

The U.S. Court of Appeals for the Seventh Circuit restricts searches to those vehicles over which the owner or occupier of the premises has exercised dominion and control. *See United States v. Percival*, 756 F.2d 600, 612-13 (7th Cir. 1985). The Fifth Circuit has rejected the dominion and control test, thereby permitting the search to include any vehicle located on the searched premises. *See United States v. Cole*, 628 F.2d 897, 899 (5th Cir. 1980) (allowing search of a vehicle driven onto the premises during the execution of a search warrant). The Tenth Circuit has settled for a rule permitting an officer to search a vehicle if he acted "reasonably" in assuming (even if the assumption is later found to be in error) that the owner of the premises had control over the vehicle. *See United States v. Gottschalk*, 915 F.2d 1459, 1461 (10th Cir. 1990).

Like so many issues arising out of the simple constitutional maxim condemning "unreasonable" searches, the curtilage question does not lend itself to bright-line answers. The Fourth Amendment requirement of particularity "varies to some degree by what is reasonably practicable." 2 Wayne R. LaFave, *supra*, § 4.10(c), at 668. From a practical point of view, the curtilage concept should include only those vehicles which the affiant asserts have a logical link to the premises and to the target of the investigation. An inflexible rule requiring that the vehicle owner also be an occupant or owner of the premises should be rejected as both arbitrary and overly technical. When dealing with search warrants, "there is no place for technical requirements of elaborate specificity once exacted under common law pleadings." *United States v. Napoli*, 530 F.2d 1198, 1200 (5th Cir. 1976) (quotation marks and citation omitted).

Under a logical-link standard, when the investigation targets the owner of the premises, his vehicles would naturally be included with the curtilage description "even where the vehicle is not named in the warrant." *Glenn*, 10 Va. App. at 156, 390 S.E.2d at 508-09. When the affiant asserts that the *owner of the vehicle* (but not the owner of the premises) is the target of the investigation and probable cause exists linking the target to the premises, a logical link exists between the suspect, the non-suspect's premises, and the suspect's vehicle. A search of the vehicle under these circumstances should likewise be valid.

Here, the search warrant affidavit asserted that (i) the suspect owned the El Camino, (ii) the vehicle was parked at the Bridge Road premises, and (iii) the suspect made two brief stops at the premises on June 17 and 18 prior to arriving at the West residence with deliveries of cocaine. These facts show a common-sense relationship between the suspect, premises, and vehicle. *See Napoli*, 530 F.2d at 1200 (a camper owned by suspect may be searched when parked at premises owned by the suspect's mother); *United States v. Beall*, 581 F. Supp. 1457, 1466 (D. Md. 1984) (a warrant for search of an auto body shop justifies search of a truck parked in shop), *aff'd*, 767 F.2d 913 (4th Cir. 1985).[3] Because a sufficiently logical link exists, the "curtilage" description in the Bridge Road warrant includes the defendant's El Camino.

That said, even if the "curtilage" did not include the vehicle, the cocaine found during the search would still have been legally recovered (without the Bridge Road search warrant) when the defendant and Detective DeFreitas arrived minutes later to search the El Camino. The defendant led DeFreitas directly to the vehicle and agreed to the search. Searches conducted with the accused's consent do not implicate, much less violate, the Fourth Amendment. *See Shackleford*, 32 Va. App. at 324, 528 S.E.2d at 132; *Hughes v. Commonwealth*, 31 Va. App. 447, 454, 524 S.E.2d 155, 159 (2000).

Under the inevitable discovery doctrine, "if the government can prove that the evidence [obtained by illegal means] would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury." *Timbers v. Commonwealth*, 28 Va. App. 187, 199-200, 503 S.E.2d 233, 239 (1998) (quoting *Nix v. Williams*, 467 U.S. 431, 447 (1984)). This doctrine requires that the Commonwealth show:

> (1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct; (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct, and (3) that the police also prior to the misconduct were actively pursuing the alternative line of investigation.

*Timbers*, 28 Va. App. at 199-200, 503 S.E.2d at 239 (quoting *Walls v. Commonwealth*, 2 Va. App. 639, 656, 347 S.E.2d 175, 185 (1986), and

---

[3] Though reserving for another day the issue "whether a vehicle of someone other than an occupant of the premises could be searched," *Glenn*, 10 Va. App. at 156, n. 1, 390 S.E.2d at 508, n. 1, the Virginia Court of Appeals in *Glenn* cited with approval both *United States v. Napoli* and *United States v. Beall*.

*United States v. Cherry*, 759 F.2d 1196, 1204 (5th Cir. 1985)); *see also White v. Commonwealth*, 24 Va. App. 234, 241, 481 S.E.2d 486, 489, *aff'd en banc*, 25 Va. App. 662, 492 S.E.2d 451 (1997).

The evidence satisfies the first two criteria for the inevitable discovery doctrine. First, Detective DeFreitas and the defendant would have found the cocaine in the El Camino with or without the Bridge Road search warrant. They arrived only moments after Detective Wright recovered the evidence pursuant to the search warrant. Second, the main leads "making the discovery inevitable" were the defendant's being taken into police custody at the time of his arrest — which occurred at 9:45 a.m. on June 18 — and his initial willingness to cooperate with the investigation.

The Commonwealth has also carried its burden on the third criterion. Detective DeFreitas was "actively pursuing the alternative line of investigation" by beginning the interrogation of the defendant at his home shortly after his arrest. This interrogation involved a "continuous" dialogue with the defendant from the morning until about noon when the defendant asked to speak to an attorney. Hearing Transcript at 64. At 2:00 p.m. that same dialogue, between the same two people, picked up where it left off when the defendant said he wanted to "cooperate" without an attorney and to tell DeFreitas "where the drugs were." *Id.* at 65.

This *alternative* line of investigation, therefore, began hours before the issuance of the allegedly defective search warrant at 1:30 p.m. *Cf. Warlick v. Commonwealth*, 215 Va. 263, 267, 208 S.E.2d 746, 749 (1974) (defendant voluntarily decided, independent of the allegedly unlawful police procedures, to "lead the police to the cache of drugs"), *with Nix*, 467 U.S. at 444 (rationale of the independent source exception is "wholly consistent" with inevitable discovery doctrine). For these reasons, the inevitable discovery doctrine applies — rendering moot any objection to the legality of the Bridge Road search warrant.

## IV

In sum, the Court denies the defendant's motion to suppress his in-custody statements to Detective DeFreitas. No violation of *Miranda* has occurred here. The Court also declines the defendant's invitation to apply the exclusionary rule to the incriminating evidence found by police in his van and his El Camino. The recovery of these items did not violate the defendant's Fourth Amendment rights. The search warrants issued by the magistrate satisfied the probable cause standard and adequately identified the places to

516

be searched. Moreover, the inevitable discovery doctrine further protects the search of the defendant's El Camino from legal challenge. It is so ordered.