## CIRCUIT COURT OF AUGUSTA COUNTY

Commonwealth of Virginia

    v.

Robert Tyler Anthony Martinez

August 26, 2014

Case Nos. CJ13000077, CJ13000078, CJ13000079

BY JUDGE VICTOR V. LUDWIG

The defendant, Robert Tyler Anthony Martinez, moves this Court to suppress any statements or purported confessions that he made to the investigating officers on August 8 and August 9, 2013. The first occurred in the kitchen of Martinez's home, with members of his family present; the second occurred in an interrogation room at the Office of the Sheriff of Augusta County after the investigator had advised Martinez of his *Miranda* rights.

With respect to the first interrogation, Martinez argues that he was in custody and that his admissions were not voluntarily made. With respect to the second interrogation, Martinez argues that he was in custody, that he did not knowingly and intelligently waive his *Miranda* rights, and that his admissions were not voluntarily made.

### I. *Facts*

#### A. *Applicable to Both Interviews*

Dr. Kenneth Showalter, having qualified as an expert, testified that he had interviewed Martinez on two occasions, once for 45 minutes and later for approximately an hour. He testified that Martinez's test results indicated

that he has an IQ of 70 (the average person has an IQ of 100) and that an IQ of 69 yields a diagnosis of mental retardation. During the interviews, they discussed Martinez's ability to assess his legal situation, and Showalter analyzed whether he could think rationally and be able to project possible outcomes depending on a selected course of action.

Regarding competency to stand trial (an issue which the Court had previously addressed), Showalter said that Martinez had a grasp of certain facts and knowledge, he had a rudimentary understanding of a plea bargain, but Showalter was concerned about Martinez's ability rationally to understand some of the information that was provided, in terms of how to apply it to his own case. Again, in terms of competency to stand trial, Showalter was concerned about his inability to fully grasp what was going on, *e.g.*, Martinez commented that he probably had a good case because it took the authorities so long to get the evidence.

Showalter agreed that Martinez had some basic factual knowledge, but he did not have a rational understanding of the situation or fully appreciate everything that is involved in the process. Showalter agreed that people with low IQs can understand concepts that are explained to them. He also agreed that Martinez did have that ability, but it took more explanation or repetition for him to do so.

## B. *August 8 Interview*

The interview was recorded, and it was admitted as Commonwealth's Exhibit 1 (CW1). Investigator Michael Roane testified that, having become involved in the investigation through Child Protective Services and having already interviewed the alleged victim, he first interviewed Martinez at the home of Ms. Payne, Martinez's grandmother, beginning as early as 9:00 p.m. and as late as 10:00 p.m. on August 8. Susan Peters, Martinez's mother, said that it was at Martinez's aunt's home, although Payne was present as well. When Roane arrived, Payne met him outside, he asked if he could speak to Martinez, and the grandmother gave him permission to do so. Peters was present, as well, and she testified that she did not object to the officer's interviewing her son because she did not know that she had a choice in the matter. In the event, she did not have a choice. During his presence at the home, Roane was wearing khaki trousers and a polo shirt, and he was armed and displaying his badge.

After being invited to enter the house, Roane introduced himself to Martinez and explained the purpose of his visit. Roane acknowledged that, when he first met Martinez, he perceived that the boy might have some intellectual limitations, but he attempted to address that issue by asking preliminary questions. Roane testified that it was only after satisfying himself that Martinez had sufficient capacity to discuss the issues that he was comfortable continuing the process. Peters testified that it was her perception that Martinez was nervous, to the extent that he "picked at his

leg until it began bleeding." Martinez testified that he was "nervous, scared, and that [he] did not know what was going on." (Roane did not say, but the record shows that Martinez was 15 years old at the time of the interview.) Roane testified that, prior to questioning Martinez, he informed the boy that he was not under arrest and that he was free to leave, and Martinez indicated that he was willing to talk to Roane. CW1 at 3:10. CW1 confirms that assertion (at 3:00), although Martinez testified that he did not feel that he was free to leave. During Roane's questioning of Martinez at the kitchen table, there were several family members present in the general area, passing into and out of the kitchen, and either his grandmother or mother was always present and seated at the table during the interview.

The tenor of interview was conversational and not that of a hostile interrogation. Roane began by asking Martinez where he went to school. Martinez responded that he was at Minnick in Harrisonburg because of behavioral issues at his former high school, Wilson. That led to a discussion about behavioral issues with another student and his acting up in algebra class because he did not like that subject. Martinez volunteered that, since leaving Wilson, where he had a D in algebra class, he had improved his grade to a C or C+. *Id.* at 5:20.

Roane then asked Martinez if he had any intellectual disabilities, and, after a pause with no response, Roane followed up with a question about whether Martinez took any medication. Martinez quickly responded that he took Adderall and Vega. *Id.* at 5:40. Martinez subsequently explained that he took Vega to help with his behavioral issues, that it helped calm him, and that he was taking it daily as prescribed. *Id.*

Roane then asked Martinez if he knew the difference between a truth and a lie. Martinez answered affirmatively, but when asked to explain the difference in his own words Martinez initially struggled. However, Martinez was able to convey that "when you tell the truth you are talking about what the real thing is," *id.* at 6:50, and when you tell a lie "[it] is something fake or false." *Id.* Martinez was then able to distinguish successfully between a truth and a lie involving concrete examples offered by Roane.

Roane then said, "You can lie to Mom and Dad. You can lie to the teachers. You cannot lie to me." *Id.* at 7:50. "It's a big difference . . . [because] I have the authority to take away your freedom, and I don't want to do that." *Id.* "If I detect any lies we're done, and he and I[1] are like human lie detectors. We have been doing this, between the two of us, for thirty years." *Id.* at 8:20. At approximately the 9:45 mark in CW1, Roane appeared to catch Martinez in a lie about whether the pictures he showed to the alleged victim consisted just of naked girls or naked boys as well. *Id.* at 9:45. Shortly thereafter, Roane and Martinez had the following exchange:

---

[1]     Roane was referencing Deputy Spence, another officer on the scene.

Roane: "I'd be willing to [get you help] as opposed to arresting you and putting you in prison. I don't want to do that. I don't think prison is the right place for you. I don't think you would fare to well in prison. . . . Have you ever been locked up before?" ·

Martinez: "No."

Roane: "Do you want to get locked up?"

Martinez: "No."

Roane: "Do you understand that the juvenile detention center is like a maximum security prison?"

Martinez: "Yeah."

Roane: "There's murderers in there. There's bad, bad people in there."

*Id.* at 13:20. Roane then began steering the interview toward the specifics of the alleged incident. He asked leading questions and engaged in deceit by stating that "they" had evidence which he actually did not possess. Leading questions in and of themselves are not necessarily coercive, although they likely fall in the ambit of suggestions.

The last exchange in this interview that bears mentioning occurred when Roane asked if Martinez had engaged in similar behavior with anyone else. Martinez maintained numerous times that he had not. Even after Roan said, "If you have any hope of helping yourself through this — now is the only time that I'm willing to listen to you." *Id.* at 46:20. Martinez maintained his innocence of other crimes: "I'm telling you the truth. I have never done this before. I promise. Cross my heart. I promise." *Id.* at 46:40.

After Martinez expressed that he would be willing to take a polygraph test, Roane stopped asking him questions, and Martinez left the room shortly thereafter. Next Roane began discussing with Peters how they would proceed. They planned to meet the following day, and Roane informed Peters that he would charge Martinez at that time.

Roane testified that Martinez did not display any anxiety about talking to him; rather he was calm and seemed eager to hear what Roane had to tell him. Martinez was never restrained; he had a ready means of egress from the kitchen at all times, and Roane did not arrest him at the conclusion of the interview. He did, however, tell Martinez's mother that he did not want Martinez to participate in a church-sponsored outing that would have taken him out of the County (perhaps out of the Commonwealth).

## C. *August 9 Interview*

The interview was recorded, and it was admitted as Commonwealth's Exhibit 2 (CW2). Roane testified that, as a result of the interview on August 8, he concluded that he wanted to conduct an additional interview at the Sheriff's Office the following day. Peters and Martinez's aunt brought Martinez to the office that morning, where Roane met them. While Peters and the aunt waited in the lobby, Roane took Martinez to an interview room, told him that he was not under arrest and that he was free to leave if he chose to do so. Nevertheless, Roane read Martinez his *Miranda* rights, going through each element and asking if Martinez understood, in each instance, receiving an affirmative response. Roane testified that he "may have told [Martinez] that he was free to leave after" he read the *Miranda* warnings, but he was not certain of that. A review of CW2 confirms that, after reading Martinez the *Miranda* warnings, Roane did not tell him, again, that he was free to leave. Again, as on the night before, Martinez spoke without reluctance.

Martinez agreed that Roane told him that he had the right to remain silent, but he said that he did not understand what that meant, or what it meant to have an attorney present, or why that was important, or that his statements could be used against him.

The interview occurred in a small, unlocked room initially containing two chairs. No members of Martinez's family circle were with him; he was alone with the officers. Roane began the interview with a handshake and asked Martinez if he "was doing ok." After engaging in small talk, Roane clearly laid out Martinez's constitutional rights under *Miranda*. "If I say any words that you don't understand, or if I am talking and you don't understand what I am saying, I want you to stop me, and let me explain it to you because I want to make sure that you know in your mind everything that's going on." CW2 at 1:40. Roane then explained:

> Roane: "Do you understand that you are not under arrest?"
>
> Martinez: "Yeah."
>
> Roane: "Do you understand that you are free to walk out that door at any time?"
>
> Martinez: "Ok." (Nods head up and down.)
>
> Roane: "You don't have to answer any questions that you don't want to."
>
> Martinez: "Ok." (Nods head up and down.).[2] . . .

---

[2]    Roane then explained again that, if Martinez had any questions or did not understand, Martinez should stop him, and Roane would attempt to clarify his constitutional rights.

Roane: "You have the right to remain silent. Do you understand?"

Martinez: "Hm Hmh."

Roane: "Do you know what that means?"

Martinez: "I have . . . I have to be silent."

Roane: "You have the right to *remain* silent."

Martinez: "Ok."

Roane: "Which means you don't have to say anything if you don't want to."

Martinez: "Alright."

Roane: "You understand that?"

Martinez: "Yeah."

Roane: "Ok. Anything that you do say may be used against you in court. Do you understand what that means?"

Martinez: "It means whatever I say can be used in court if it is something important."

Roane: "Right. Exactly. So you understand that?"

Martinez: "Hm Hmh." (Nods head.)

Roane: "You have the right to talk to a lawyer before and during questioning. Do you understand that?"

Martinez: "I have a right to talk to a lawyer before a questions."

Roane: "Right."

Martinez: "So . . . No, No I don't."

Roane: "You have a right to have an attorney, a lawyer, represent you basically."

Martinez: "Ok."

Roane: "So do you understand that?"

Martinez: "Uh huh." (Nods head affirmatively.)

Roane: "If you cannot afford a lawyer and want one. One will be provided for you before questioning without charge. Do you understand that?"

Martinez: "So, if I can't like afford one, I can get one?"

Roane: "Yeah."

Martinez: "Yeah. Ok."

Roane: "Do you understand that?"

Martinez: "Uh huh." (Nods head affirmatively.)

Roane: "And you may exercise these rights at any time. Do you understand that?"

Martinez: "I don't know. No."

Roane: "What that means is that you can umm . . . any of the stuff we talked about before, you have a right to that at any time. You can exercise those rights at any time."

Martinez: "Ok."

Roane: "Do you understand?"

Martinez: "I think."

Roane: "Ok. Basically it means that you have the right to remain silent."

Martinez: "Uh huh."

Roane: "You know that."

Martinez: "Yeah." (Nods head.)

Roane: "Whatever you say to me can be used against you in court."

Martinez: "Ok." (Nods head.)

Roane: "And you have a right to a lawyer."

Martinez: "Ok." (Nods head.)

Roane: "So do you understand all those three things?"

Martinez: "Yeah." (Nods head.)

Roane: "Ok. So with all that in mind do you want to talk to me about this case?"

Martinez: "Yes sir." (Nods head.)

Id. at 2:20

After explaining his constitutional rights, Roane went even further to insure that Martinez's waiver was knowing and intelligent.

Roane: "You have some issues. You have ADHD?"

Martinez: "Uh huh."

Roane: "Anything else?"

Martinez: "No." (Shakes head in negative.)

Roane: "Do you take medication for anything?"

Martinez: "Uh huh." (Nods head affirmatively.)

Roane: "You take Adderall and Vega."

Martinez: "Yeah." (Nods head affirmatively.)

Roane: "And you have been taking your medication like you should have been taking it?"

Martinez: "Uh huh." (Nods head affirmatively.)

*Id.* at 5:40. The manner in which the rest of the interview was conducted was very similar in the type of questions and techniques utilized during the first interview. At various times throughout the interview Roane continued to ask about incidents or victims in addition to the allegations then under investigation.

## II. *Analysis*

A. *Regarding Whether Martinez Was in Custody during the August 8 Interview*

The obligation to give *Miranda* warnings arises when a suspect is in custody and is being interrogated. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "Whether a suspect is 'in custody' under *Miranda* is determined by the circumstances of each case, and the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Harris v. Commonwealth*, 27 Va. App. 554, 564 (1998) (quoting *California v. Beheler*, 463 U.S. 1121, 1125

(1983)) (internal quotation marks omitted). Determining whether a suspect is in custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994)).

When determining whether a suspect is in custody, the Court considers the following circumstances:

> (1) the manner in which the individual is summoned by the police, (2) the familiarity or neutrality of the surroundings, (3) the number of officers present, (4) the degree of physical restraint, (5) the duration and character of the interrogation, and (6) the extent to which the officers' beliefs concerning the potential culpability of the individual being questioned were manifested to the individual.

*Id.* at 565. "However, no single factor alone may necessarily establish custody for *Miranda* purposes, and not all factors may be relevant in a given case." *Wass v. Commonwealth*, 5 Va. App. 27, 33 (1987).

Here, Martinez was not summoned by the deputies but instead was visited by them in the familiar environment of the kitchen of a relative. To be sure, there were two officers present during the interview, but neither wore a traditional uniform, although at least Roane had a badge and a holstered sidearm. There was no physical restraint of any kind; the interviewers were at the table with Martinez, and the whole tenor of the interview was anything but hostile. The interview took nearly an hour, but the officers were neither aggressive nor belligerent, and, throughout the interview, Martinez was in the presence of some of his family. Roane clearly expressed his belief that Martinez was potentially culpable, but, based on the totality of the circumstances, I find that Martinez was not in custody during the August 8 interview.

I fully appreciate the sea change in the law announced by the United States Supreme Court in *J.D.B. v. North Carolina*, 131 S. Ct. 2394 (2011). That case involved a thirteen year old defendant who was removed from his classroom at school, questioned for at least half an hour by a uniformed officer behind the closed door of a conference room in the presence of another officer and two school administrators, all the while being denied the opportunity to call his legal guardian. That case squarely addressed "the question of whether the age of a child subjected to police questioning is relevant to the custody analysis of *Miranda v. Arizona*," *id.* at 2399, and a sharply divided Court held that "so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test." *Id.* at 2406. The Court

expressly noted that the issue of whether the child's statements were voluntary was not before it. *Id.* at 2400, n. 3.

In the pending case, of course Martinez was not thirteen at the time of the interview; he was fifteen years old, although one might argue (and, for the purpose, the Court will accept, but need not find) that his intellectual age might not have been equal to his biological age. I understand that, even by referring to that additional limitation, I tread onto the thinning ice of the traditional objective custody analysis by inserting another specific characteristic not yet recognized by the Supreme Court in this context, but one, no doubt, soon to be adopted when the proper case is presented. If the test, prior to *J.D.B.*, was "whether a reasonable person in the suspect's position would understand his freedom to terminate questioning and leave," *id.* at 2402, and it has evolved, in the appropriate fact pattern, to a standard of the reasonable understanding of a thirteen year old, it takes no imagination to conclude that it will evolve, on an appropriate fact pattern, to the standard of a reasonable fifteen year old with intellectual limitations. I understand that the path taken by the majority in *J.D.B.* leads to an objective custody analysis so diluted by specific individual characteristics as to make it nearly indistinguishable from a subjective analysis, but I see where the logic (if it is that) of the decision takes me.

He was not whisked from his classroom by uniformed officers to a conference room and isolated from his family. The officers, casually dressed, visited Martinez on his own turf and in the presence of members of his family. The doors were not closed; at worst, Martinez might have had to pass an officer to leave through any one of several exits. Just as the Supreme Court noted in *J.D.B.*, "a child's age will [not] be a determinative, or even a significant, factor in every case," *id.* at 2406; so Martinez's age, coupled with his intellectual limitation, is not determinative in this case. All other criteria, such as the reassuring presence of family members, the familiar and non-threatening surroundings of a relative's house, and the lack of physical restraint or show of force support a conclusion that it was a non-custodial interview, and the Court holds that it was.

B. *Regarding Whether Martinez' Statements during the August 8 Interview Were Voluntary*

As a preliminary matter, because I have already found that Martinez was not in custody, I need not analyze whether he knowingly and intelligently waived his rights as expressed in *Miranda*; I need only determine whether his statements were voluntarily made. I bear in mind that, when dealing with juveniles:

> If counsel was not present for some permissible reason when an admission was obtained, the *greatest care must be taken to assure that the admission was voluntary*, in the sense not

only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright, or despair.

*In re Gault*, 387 U.S. 1, 55 (1967) (emphasis added).

I am unsure how the language of *Gault* is to be construed in that it equates a "suggested" admission to a "coerced" admission. I conclude that the most reasonable construction of the inclusion of a "suggested" admission alongside a "coerced" one is that, in the context of juveniles, suggestion can result in an involuntary and compelled adoption of what an authority figure suggests.

The burden is on the Commonwealth to prove that extra-judicial confessions are voluntarily made. *Campbell v. Commonwealth*, 194 Va. 825, 830 (1953). Even when a confession is made after a knowing and intelligent waiver of Fifth and Sixth Amendment rights, it may still be inadmissible if it was involuntarily given. *Miller v. Fenton*, 474 U.S. 104, 108-09 (1985). "Whether a confession was voluntary or the result of coercive police activity is a legal question to be determined from a review of the totality of the circumstances." *Morris v. Commonwealth*, 17 Va. App. 575, 579 (1994) (citing *Miller* at 474 U.S. 110-12). Therefore, the critical question is whether Martinez's confession was voluntary or coerced. The law of the Commonwealth is clearly stated in *Rodgers v. Commonwealth*, 227 Va. 605, 609 (1984), which held:

> The test for voluntariness derives from federal constitutional law relating to the Fifth Amendment as applied to the States through the Fourteenth Amendment. In *Stockton* [*v. Commonwealth*, 227 Va. 124 (1984)], we relied upon *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973), and concluded that in order to determine whether a statement is voluntary, we must decide, in light of the totality of the circumstances, whether the statement is the product of an essentially free and unconstrained choice by its maker, or whether the maker's will has been overborne and his capacity for self-determination critically impaired.

227 Va. at 140.

In evaluating the totality of the circumstances, the Court must consider a myriad of factors, including the defendant's age, intelligence, background, and experience with the criminal justice system, the purpose and flagrancy of any police misconduct, and the length of the interview. *Harrison v. Commonwealth*, 3 Va. App. 260, 264-65 (1986). Martinez was a fifteen year old boy with an IQ of 70, and the evidence did not disclose that he had had any background or experience with the criminal justice system. The length

of the interview, approximately one hour, was hardly excessive, given the issues that were the topic of discussion.

With respect to police misconduct and its flagrancy, I "must consider the interrogation techniques employed, including evidence of trickery and deceit, psychological pressure, threats or promises of leniency, and duration and circumstances of the interrogation." *Washington v. Commonwealth*, 43 Va. App. 291, 303 (2004) (quoting *Terrell v. Commonwealth*, 12 Va. App. 285, 291 (1991)). I have already addressed the final two considerations, the duration and circumstances of the interrogation. However, the "Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion." *Kauffmann v. Commonwealth*, 8 Va. App. 400, 406 (1989) (quoting *Colorado v. Connelly*, 479 U.S. 157, 170 (1986)). Indeed, "evidence of coercive police activity 'is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment'." *Commonwealth v. Peterson*, 15 Va. App. 486, 488 (1992) (quoting *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)).

With respect to promises of leniency or threats supporting a conclusion that they are components of coercion to the level that an accused's will is overborne, the Court in *Hill v. Commonwealth*, 52 Va. App. 313, 322 (2008), observed that "what renders a confession involuntary is not any threat or promise, but rather a threat or promise of illegitimate action." (citing *United States v. Contreras-Del Toro*, 892 F. Supp. 159, 160 (N.D. Tex. 1995) (aff'd, 129 F.3d 612 (5th Cir. 1997)). The only statements Roane made that could be construed as threats (and they were threats only by negative implication) were either true statements or Roane's characterization of incarceration. *E.g.*, "I'd be willing to [get you help] as opposed to arresting you and putting you in prison. I don't want to do that. I don't think prison is the right place for you. I don't think you would fare to well in prison. . . . There's murderers in there. There's bad, bad people in there." In addition, the comments made by Roane which could be characterized as promises were not promises of illegitimate action. In *Washington*, the Court held that the officer's implication of leniency[3] in exchange for cooperation was not coercive. 43 Va. App. at 304 (The officer's statement was not an actual promise of leniency, and the officer never claimed to have the power to affect the decision of the Commonwealth's Attorney's office.). Roane never guaranteed Martinez that, by cooperating, he would receive any benefit. The detective never indicated that he had authority to guarantee leniency in the prosecution of the case or to affect the sentence to which Martinez was exposed or anything else.

It is true that Roane utilized trickery and deceit by telling Martinez that "I already know what happened," and "somebody ejaculated and we have

---

[3]    *E.g.*, "I want to get you help;" "I'm here to help you;" and "I damn sure don't want to put kids in jail."

evidence of that . . . and it's not going to be [the victim's]." CW1 at 23:00. That these statements were untrue became clear at the end of the recording of the first interview when Roane commented that all he had to go on was the alleged victim's statement that Martinez had touched his penis and his buttocks. *Id.* at 1:08:20. However, the Supreme Court of Virginia has made it clear that this stratagem does not *per se* violate the Constitution. "Even a lie on the part of an interrogating police officer does not, in and of itself, require a finding that a resulting confession was involuntary." *Rodgers v. Commonwealth*, 227 Va. at 616.

Here, Martinez was in familiar surroundings with relatives present, and their presence helped counterbalance any psychological pressure to make an involuntary confession to an authority figure employing widely utilized interrogation techniques. In considering whether Martinez's will was overborne and that, as a juvenile of limited intelligence, he was compelled to adopt the suggestions implicit in the investigators' leading questions, I note that Martinez clearly demonstrated in one instance the capacity to reject the investigators' suggestions and to adhere to his version of events. Specifically, when questioned somewhat intensely about whether there were other victims, Martinez adamantly maintained numerous times that there were none. Even after Roane said, "If you have any hope of helping yourself through this, now is the only time that I'm willing to listen to you," CW1 at 46:20, Martinez still said, "I'm telling you the truth. I have never done this before. I promise. Cross my heart. I promise." *Id.* at 46:40.

The fact that the investigators utilized the same tactics throughout the first interview and that Martinez was able successfully to demonstrate that his will was not overborne and that he did not feel compelled to accept the investigators' suggestions at the end of the interrogation, when he would be most susceptible to having had his will worn down, demonstrates that Martinez's statements in the first interview were voluntary, considering the totality of the circumstances.

C. *Regarding Whether Martinez Was in Custody during the August 9 Interview*

The applicable law, as discussed in part A *supra*, applies with equal force here.

At Roane's request, members of Martinez's family brought Martinez to the Sheriff's office on the morning of August 9, which was the morning following the previous night-time interview at a family residence. The environment was starkly different from that of the previous night. The surroundings were not the comfortingly familiar sights and smells of a family kitchen in which relatives were in the same room, but instead a bare, small, stark room in the inherently coercive environs of a police station where Martinez was shut off and separated from the support of relatives or an attorney. For the majority of the second interview, Roane and Martinez

were alone in the room; however, toward the end of the interview Spence entered the room to participate in interrogating Martinez. At no point did the investigators lock the door or physically bar Martinez from leaving.

Granted Martinez was not physically restrained in any way, and he was even told that he could leave, but, applying the law as discussed in *J.D.B.*, I find that Martinez was in custody. A person of Martinez's age and lack of intelligence would have reasonably concluded that he was not free to leave because of the following factors: (1) he had been separated from his family; (2) he had been placed in a small separate room in a police station; (3) the authority figure, Roane, manifestly expressed that he did not just think, but knew, that Martinez was culpable; and (4) even though Martinez had been told that he was free to leave the room, Roane's act of closing the door when he momentarily left the room instead of leaving it open sent the clear message that Martinez had to stay in that room until Roane decided that Martinez could leave the room.

## D. *Regarding Whether Martinez's Waiver of His Rights as Discussed in Miranda Was Knowing and Intelligent*

The Court cannot accept a waiver of constitutional rights designed to guarantee a fair trial and the reliability of the truth determining process unless that waiver was knowing and intelligent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 235-36 (1973). A knowing and intelligent waiver requires "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). However, a "full and complete appreciation of all the consequences flowing" from an abandonment of one's rights is not required. *Oregon v. Elstad*, 470 U.S. 298, 316-17 (1985). The relevant question is not whether the "criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege," but rather whether the "suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Colorado v. Spring*, 479 U.S. 564, 574 (1987).

In addition, the Commonwealth must "prove by a preponderance of the evidence . . . that the accused knowingly, intelligently, and voluntarily waived his [constitutional] rights." *Rodriguez v. Commonwealth*, 40 Va. App. 144, 155 (2003). I note that:

> [t]he inquiry whether a waiver of [constitutional] rights was made knowingly and intelligently is a question of fact, and the trial court's resolution of that question is entitled on appeal to a presumption of correctness. In considering this issue, the trial court evaluates the credibility of the witnesses, resolves any conflicts in their testimony, and weighs the evidence as a

> whole. A finding as to whether the waiver of [constitutional] rights was knowing and intelligent must be based on the totality of the circumstances.

*Id.* at 155-56 (internal quotations and citations omitted). Further, while intelligence is a factor, a person's IQ is not a sole dispositive measure for determining if a person is able to make a knowing and intelligent waiver of his constitutional rights. Although it addresses a different issue, I find *Hall v. Florida*, 134 S. Ct. 1986 (2014), illustrative of the danger of relying solely on a person's IQ to determine his or her intellectual capacity, whether it be for a knowing and intelligent waiver of one's constitutional rights or for determining the efficacy of a certain sentence. Courts in the Commonwealth have found that people with low intelligence, as indicated by their IQ or other indicators, may still be able to make a knowing and intelligent waiver of their constitutional rights. *See Lewis v. Commonwealth*, 2009 Va. App. LEXIS 357 (2009) (the defendant's waiver was found to be knowing and intelligent despite his only completing the ninth grade and having been labeled borderline mentally retarded); *Hickman v. Commonwealth*, 1995 Va. App. LEXIS 555 (1995) (waiver by an eighth grade student with a recorded IQ of 67 found to be knowing and intelligent); *see also Goodwin v. Commonwealth*, 3 Va. App. 249 (1986) (waiver found to be knowing and intelligent despite the defendant's having a previously recorded IQ of 56 and having been highly intoxicated approximately three hours before waiving his constitutional rights).

I find based on the totality of the circumstances that Martinez's waiver of his constitutional rights was knowing and intelligent for the following reasons: (1) Martinez was alert and attentive to Roane; (2) Martinez gave verbal and nonverbal assent when asked if he understood his rights; (3) Martinez told Roane he did not understand his right to have an attorney present during questioning, and, after further explanation from Roane, then gave his assent that he understood his rights;[4] (4) Martinez would go through the cognitive exercise of formulating in his own words his rights; (5) the deliberate, repetitive, and simple language utilized by Roane; and (6) Martinez's decision at the end of the extensive colloquy to talk to Roane. The manner in which Roane explained to Martinez his constitutional rights and subsequently obtained his waiver was well done and stands in stark contrast to *Commonwealth v. Brown*, 2002 Va. App. LEXIS 314 (2002), in which a detective's poor procedure resulted in a waiver being found not to be knowing and intelligent. While it may be that Martinez did not have a full appreciation of all the ramifications of

---

4    This factor is important because it shows that Martinez was not just saying "yes," but was able on his own volition to express that he did not understand something. Hence, when, after further explanation, he gave his assent, the inference is that he then understood after the additional amplification.

waiving his constitutional rights, I am satisfied that he was fully aware of his rights and the negative consequence that his words could be used against him in court.

E. *Regarding Whether the Statements Made during the August 9 Interview Were Voluntary*

The applicable law, as discussed in part B *supra*, applies with equal force here, but with a different result. In this interview, Roane and Spence engaged in the same techniques and tactics that they utilized the night before. However, during this interview, counterbalancing effects of a family residence with relatives present during the questioning were notably absent. Martinez, a juvenile of limited intelligence with no prior experience in dealing with the justice system,[5] faced — alone — an adversarial system in which authority figures utilized deceit and psychological pressure to produce another statement and did so in the confines of a sterile and understandably intimidating closed-door room in which Martinez was isolated from his family support structure.

> By its very nature, custodial police interrogation entails "inherently compelling pressures." *Miranda, 384 U.S., at 467, 86 S. Ct. 1602, 16 L. Ed. 2d 694*. Even for an adult, the physical and psychological isolation of custodial interrogation can "undermine the individual's will to resist and . . . compel him to speak where he would not otherwise do so freely." *Ibid.* Indeed, the pressure of custodial interrogation is so immense that it "can induce a frighteningly high percentage of people to confess to crimes they never committed." *Corley v. United States*, 556 U.S. 303, 321, 129 S. Ct. 1558, 173 L. Ed. 2d 443, 458 (2009).

*J.D.B.*, 131 S. Ct. at 2402. Moreover:

> [b]ecause custodial police interrogation, by its very nature, isolates and pressures the individual, we stated that "even without employing brutality, the 'third degree' or [other] specific stratagems . . . custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals." 384 U.S. at 455. We concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements. . . .

*Dickerson v. United States*, 530 U.S. 428 (2000).

---

[5] No evidence was offered by the Commonwealth to the contrary.

I appreciate that the decision in *Miranda* was the Court's effort to assist the defendant to cope with the pressures inherent in a custodial interrogation by ensuring that he understood his right to remain silent and that the decision in *Dickerson* was to clarify that the *Miranda* decision established a constitutional rule so that even a voluntary statement made by a defendant in custody, but without advice of his *Miranda* rights, was inadmissible. Moreover, I understand that neither case specifically addressed the indicia of the voluntariness of the statement. Nevertheless, both establish that a custodial interrogation is inherently coercive. Given that I have already decided that Martinez was in custody during the interview of August 9, it is clear that it was an inherently coercive environment, and that is an additional factor to be considered in assessing the voluntariness of his statement. That factor is to be one of the totality of the circumstances and, equally important, it is one that distinguishes the confession of August 9 from the confession of August 8.

As I noted above, in the interview on August 8, Martinez had adamantly maintained numerous times that there had been no other victims, and, despite Roane's best efforts to solicit additional inculpatory information, Martinez resisted. At the second interview a day later, isolated and alone, Martinez's was asked multiple times if there was anyone else whom he had abused. Martinez was asked about other victims throughout the interview (CW2 at 17:00, 19:00, 20:00, and 21:00) and maintained that this was the only incident until he was worn down at the 37:00 mark. Although he initially denied it, Martinez ultimately admitted that he did, "maybe once," touch someone else. CW2 at 37:00.

The officer's use of deceit by stating that the authorities possessed evidence which they did not have (and, arguably, the psychological pressure of persistent and repetitively leading questions) was misconduct in both interviews. However, the totality of the circumstances changed so that the impact of misconduct on August 8 was minimal, but, on August 9, its coercive effect, in light of the circumstances of that interview, was far more significant, resulting in Martinez's will being overborne. Therefore the Court will suppress Martinez's statements from the August 9 interview.

I fully understand the apparent inconsistency in the Court's holding in this case, *i.e.*, that the very same interrogation techniques utilized against Martinez on successive days do not render his statement inadmissible in one set of circumstances on one day but do render it inadmissible in other, far different, circumstances, on the second day. That, however, is the natural product of assessing the totality of the circumstances, taking into account that the circumstances of August 8 were far different from those of August 9. I note, too, that "misconduct" is a word charged with negative and pejorative connotations, but it is gauged on the sliding scale of the other attendant facts. What is unremarkable in significance in the context of one set of facts is fatal in another. Indeed, "[t]he amount of coercion necessary

to trigger the Due Process Clause may be lower if the defendant's ability to withstand the coercion is reduced by intoxication, drugs, or pain,[6] but *some* level of coercive police activity must occur before a statement or confession can be said to be involuntary. *See United States v. Haddon*, 927 F.2d 942, 945 (7th Cir. 1991); *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988), *cert. denied*, 490 U.S. 1020, 104 L. Ed. 2d 181, 109 S. Ct. 1744 (1989)." *Commonwealth v. Peterson*, 15 Va. App. 486, 488 (1992) (emphasis in original). Hence, what was tolerable (or at least inconsequential) on August 8 was not so on August 9.

### III. *Conclusion*

In summary, the Court finds that Martinez was not in custody during the first interview and that his statement on August 8 was voluntary. However, during the second interview on August 9, Martinez was in custody, and, although he intelligently and knowingly waived his constitutional rights, his statements during the second interview were not voluntarily made. As a result, the Motion To Suppress is granted in part and denied in part.

---

[6] And to be added to that, I suggest, is the diminished intellectual capacity of a low-functioning juvenile.